

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LAUREN M. HALES,<br><br>   Plaintiff,<br><br>**vs.**<br><br>TIMBERLINE KNOLLS, LLC, now known as R.M. BROWN ENTERPRISES, LLC, KIMBERLY D. DENNIS, M.D., SEMONE M. WEST, M.D., THOMAS DATTALO and MARK DeDONATO,<br><br>   Defendants. | 15CV2622<br>JUDGE DURKIN<br>MAG. JUDGE KIM |

FILED

MAR 2 7 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff, LAUREN M. HALES, by and through her attorney, LAW OFFICES OF JAMES A. HALES, PLLC, and complaining of Defendants, TIMBERLINE KNOLLS, LLC, now known as R.M BROWN ENTERPRISES, LLC, KIMBERLY D. DENNIS, M.D., SEMONE M. WEST, M.D., THOMAS DATTALO and MARK DeDONATO, states the following:

## JURISDICTION AND VENUE

1.  This court has subject matter jurisdiction herein based upon diversity of citizenship between Plaintiff and Defendants pursuant to 28 USC § 1332(a)(1); and further based

upon 28 USC § 1331, to wit, The Protection and Advocacy for Individuals with Mental Illness Act of 1986, as amended, 42 USC § 10801, et seq., P.L. 106-310.

2.     Venue for this action is proper in the United States District Court for the Northern District of Illinois, Eastern Division pursuant to 28 USC § 1391(b), because the events and omissions that gave rise to this Complaint occurred in this district.

## PARTIES

3.     Plaintiff, LAUREN M. HALES (hereafter "LAUREN"), is and at all relevant times referred to herein was a resident of Des Moines County, Iowa.

4.     Defendant, TIMBERLINE KNOLLS, LLC, now known as R.M. BROWN ENTERPRISES, LLC (hereafter "TIMBERLINE KNOLLS"), is a Delaware limited liability company registered in the State of Illinois as a foreign limited liability company authorized to transact business in Illinois.

5.     At all relevant times referenced herein, TIMBERLINE KNOLLS was licensed, accredited and authorized to transact business in Illinois as an Alcoholism & Substance Treatment Services Provider pursuant to a license issued by the Illinois Department of Human Services, Division of Alcoholism and Substance Abuse.

6.     In conjunction with said license, at all relevant times referenced herein TIMBERLINE KNOLLS was transacting business pursuant to said license at a facility located at 40 Timberline Drive, Lemont, IL 60439 commonly known as Timberline Knolls.

7.     Said business conducted by TIMBERLINE KNOLLS included the providing of Level III Adolescent Residential Extended Care Services pursuant to a contract issued by the Illinois Department of Human Services, Office of Alcoholism and Substance Abuse.

8.     At all relevant times referenced herein, Timberline Knolls was a mental health facility as defined in 405 ILCS 5/1-114.

9.     Plaintiff is informed and believes and thereon alleges that Defendant, KIMBERLY D. DENNIS, M.D., (hereafter "DENNIS") is and at all relevant times referred to herein was a resident of Cook County, Illinois.

10.     DENNIS is and at all relevant times referenced herein was licensed by the Illinois Department of Finance and Professional Regulation as a Physician and as a Physician - Controlled Substance pursuant to the Illinois Medical Practice Act of 1987 (225 ILCS 60/).

11.     At all relevant times referenced herein, DENNIS was employed by TIMBERLINE KNOLLS as the Medical Director and CEO of Timberline Knolls.

12.     At all relevant times referenced herein, DENNIS was the agent of TIMBERLINE KNOLLS with respect to acts she performed or failed to perform in her capacity as the Medical Director and CEO of Timberline Knolls.

13.     Plaintiff is informed and believes and thereon alleges that Defendant, SEMONE M. WEST, M.D., (hereafter "WEST") is and at all relevant times referred to herein was a resident of Cook County, Illinois.

14.     WEST is and at all relevant times referenced herein was licensed by the Illinois Department of Finance and Professional Regulation as a Physician and as a Physician - Controlled Substance pursuant to the Illinois Medical Practice Act of 1987 (225 ILCS 60/).

15.     At all relevant times referenced herein, WEST was employed by TIMBERLINE KNOLLS as a Treating Psychiatrist who provided medical care to patients at Timberline Knolls.

16.    At all relevant times referenced herein, WEST was the agent of TIMBERLINE KNOLLS with respect to acts she performed or failed to perform in her capacity as a Treating Psychiatrist at Timberline Knolls.

17.    At all relevant times referenced herein, WEST was LAUREN'S Treating Psychiatrist at Timberline Knolls.

18.    Plaintiff is informed and believes and thereon alleges that Defendant, THOMAS DATTALO (hereafter "DATTALO") is and at all relevant times referred to herein was a resident of Cook County, Illinois.

19.    At all relevant times referenced herein, DATTALO was employed by TIMBERLINE KNOLLS as the President and Administrator of Timberline Knolls.

20.    At all relevant times referenced herein, DATTALO was the agent of TIMBERLINE KNOLLS with respect to acts he performed or failed to perform in his capacity as President and Administrator of Timberline Knolls.

21.    Plaintiff is informed and believes and thereon alleges that Defendant, MARK DeDONATO, (hereafter "DeDONATO") is and at all relevant times referred to herein was a resident of Cook County, Illinois.

22.    At all relevant times referenced herein, DeDONATO was employed by TIMBERLINE KNOLLS as the Director of Continuing Care at Timberline Knolls.

23.    At all relevant times referenced herein, DeDONATO was the agent of TIMBERLINE KNOLLS with respect to acts he performed or failed to perform in his capacity as the Director of Continuing Care at Timberline Knolls.

24.     At all relevant times referenced herein, the acts and failures to act by Defendants,

DENNIS, WEST, DATTALO and DeDONATO, as alleged herein were done in the course and

scope of their respective agencies with TIMBERLINE KNOLLS.

### GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

25.     While still a minor of 15 years of age, LAUREN received inpatient mental health

care at Timberline Knolls beginning on or about September 18, 2010, and continuing until her

discharge on or about January 20, 2011.

26.     LAUREN reached the age of majority on March 28, 2013, her 18th birthday.

27.     At the time of her admission to Timberline Knolls, LAUREN had a multi-year

history of significant mental illness and emotional impairments requiring psychiatric and

psychological treatment.  Said history included, but is not limited to:  Axis I diagnoses of Major

Depressive Disorder and Oppositional Defiant Disorder as those terms were defined by the then-

current Diagnostic and Statistical Manual of Mental Disorders: DSM-IV (1994) published by the

American Psychiatric Association; a suicide attempt approximately one week before LAUREN's

admission to Timberline Knolls; frequent suicidal ideation; an extensive history of self-harm;

and a recent episode of cocaine ingestion and acute alcohol poisoning requiring hospital

treatment on or about September 4, 2010.

28.     As indicated in the "Master Treatment Plan Problem List" created by Timberline

Knolls personnel on September 18, 2010, at the time of LAUREN's admission to Timberline

Knolls she had been diagnosed as suffering from four separate and distinct types of mental

illness based upon criteria establishing Axis I Clinical Syndromes as set forth in then-current

Diagnostic and Statistical Manual of Mental Disorders IV – Text Revision (DSM IV–TR)

published by the American Psychiatric Association, to wit: Major Depressive Disorder;

Oppositional Defiant Disorder; Alcohol Dependence and Cannabis Dependence.

29.     As further indicated in said "Master Treatment Plan Problem List", at the time of

LAUREN's admission to Timberline Knolls, the "Severity of Problem" with respect to each such

DSM IV–TR Axis I diagnosis was determined by Timberline Knolls personnel to constitute

"Severe Impairment".

30.     Prior to November 23, 2010, Timberline Knolls personnel were informed and had

actual knowledge of LAUREN's history of mental illness as aforesaid, including a recent suicide

attempt and frequent suicidal ideation; were informed and had actual knowledge that LAUREN

was still suffering from mental illness; and were informed and had actual knowledge that

LAUREN's family history included the commission of suicide by her maternal uncle due to

substance abuse.  Said personnel include, but are not limited to, WEST and all other members of

LAUREN's treatment team at Timberline Knolls; and various employees who had been charged

with the responsibility to implement and maintain security measures at Timberline Knolls.

31.     Prior to November 23, 2010, in her capacity as Medical Director at Timberline

Knolls, DENNIS knew or should have known that LAUREN's history of mental illness as

aforesaid included a recent suicide attempt and frequent suicidal ideation; that LAUREN was

still suffering from mental illness; and that LAUREN's family history included the commission

of suicide by her maternal uncle due to substance abuse.

32.     Prior to November 23, 2010, in his capacity as President and Administrator at

Timberline Knolls, DATTALO knew or should have known that LAUREN's history of mental

illness as aforesaid included a recent suicide attempt and frequent suicidal ideation; that

- 6 -

LAUREN was still suffering from mental illness; and that LAUREN's family history included the commission of suicide by her maternal uncle due to substance abuse.

33. Prior to November 23, 2010, in his capacity as Director of Continuing Care at Timberline Knolls, DeDONATO knew or should have known that LAUREN's history of mental illness as aforesaid included a recent suicide attempt and frequent suicidal ideation; that LAUREN was still suffering from mental illness; and that LAUREN's family history included the commission of suicide by her maternal uncle due to substance abuse.

34. On November 23, 2010, LAUREN was residing in a building utilized by Timberline Knolls as an adolescent treatment facility known as "Oak Lodge."

35. Plaintiff is informed and believes and thereon alleges that, on November 23, 2010, approximately thirty-five (35) adolescent female patients of Timberline Knolls were residing at Oak Lodge, all of whom were receiving inpatient mental health care.

36. At all relevant times referenced herein, LAUREN and other adolescent patients residing at Oak Lodge had been diagnosed with mental disorders categorized as Substance Abuse or Substance Dependence as those terms were defined by the then-current DSM IV–TR.

37. In the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) released May 18, 2013, the revised chapter entitled "Substance-Related and Addictive Disorders" includes substantive changes to the disorders as well as changes to the criteria describing certain conditions, including a combination of the DSM-IV categories of Substance Abuse and Substance Dependence into a condition identified as Substance Use Disorder.

38. On November 23, 2010, LAUREN and the other adolescent patients residing at Oak Lodge who suffered from mental disorders related to substances, whether applying the then-current criteria of DSM-IV or recently published DSM-5, were at a significantly heightened risk

with respect to the potential for substance abuse and the dangers to mind and body associated therewith.

39.     On November 23, 2010, a substantial amount of controlled substances in the form of the prescription medication zolpidem, marketed and sold under the trade name "Ambien", were brought onto the Oak Lodge premises by one of the Timberline Knolls patients without authorization to do so by Timberline Knolls.

40.     At the time said patient brought zolpidem onto the Oak Lodge premises, the security measures utilized by Timberline Knolls to prevent the introduction of unauthorized controlled substances onto the Oak Lodge premises were insufficient to prevent said patient from doing so.

41.     At the time said patient brought zolpidem onto the Oak Lodge premises, she was returning to Oak Lodge after an off-site visit with her parent, who accompanied said patient during the return to Oak Lodge.

42.     At the time said patient brought zolpidem onto the Oak Lodge premises accompanied by her parent, she was not searched by any personnel of Timberline Knolls.

43.     On November 23, 2010, said patient who brought zolpidem onto the Oak Lodge premises distributed some or all of the zolpidem to other patients, including LAUREN.

44.     Upon being given the zolpidem by said patient, LAUREN immediately took all of the zolpidem that had been given to her and ingested it at one time.

45.     When taken in prescribed dosages, the potential psychotropic side effects of zolpidem include hallucinations, depression, psychosis, and suicidal ideation.

46.     When taken in greater quantities, acute zolpidem overdose can occur resulting in diverse symptomatology and pathology, including death.

47.     The quantity of zolpidem distributed to and ingested by LAUREN on November 23, 2010, far exceeded the dosage for an individual deemed medically appropriate by the American Medical Association and the medical community in and around Lemont, Illinois.

48.     Said ingestion by LAUREN resulted in an acute overdose of zolpidem as defined by criteria established by the American Medical Association and the medical community in and around Lemont, Illinois.

49.     On November 23, 2010, some of the other adolescent patients residing at Oak Lodge also ingested zolpidem in quantities exceeding the dosage for an individual deemed medically appropriate by the American Medical Association and the medical community in and around Lemont, Illinois.

50.     Said ingestions by other patients resulted in acute overdoses of zolpidem as defined by criteria established by the American Medical Association and the medical community in and around Lemont, Illinois.

51.     As indicated in a Timberline Knolls form entitled "CLINICAL NOTES", at 8:00 p.m. on November 23, 2010, a nurse discovered that LAUREN had taken an overdose of zolpidem.

52.     As indicated in records of the Homer Fire Protection District, at 8:48 p.m. on November 23, 2010 a call was received requesting that an ambulance and emergency responders be dispatched to Timberline Knolls.

53.     Although a Timberline Knolls form entitled "REFERRAL TO ANOTHER FACILITY", indicates that LAUREN was transported from Timberline Knolls to "Bolingbrook ER" by ambulance on November 23, 2010 at 8:30 p.m., and further indicates "Reason for

Referral: Overdosed on Ambien", LAUREN was instead transported to the Emergency Department at Silver Cross Hospital in New Lenox, Illinois.

54. As indicated in an entry dated November 24, 2010, on a Timberline Knolls form entitled "Treatment Plan" for LAUREN, she was "hospitalized due to an overdose."

55. A total of six adolescent girls who were patients at Timberline Knolls were transported to various hospital emergency rooms in the local area after ingesting zolpidem at Oak Lodge on November 23, 2010.

56. As indicated in the Silver Cross Hospital ED Physician Documentation, shortly after her arrival at the Emergency Department, LAUREN "verbalized concern for other residents involved in this incident, asked if anyone had died."

57. As a result of not knowing whether any of the other patients who overdosed at Oak Lodge had died, LAUREN was extremely upset and worried about what had happened to those other patients, causing her to experience severe emotional distress, mental anguish and anxiety for a significant period of time until she eventually learned that all of the other patients had survived.

58. While being treated at the Silver Cross Hospital Emergency Department, LAUREN experienced an episode of emotional distress, mental anguish and anxiety that was so severe she had to be placed in 5-point leather restraints pursuant to a Physician's Order which indicates "HIGH RISK OF INJURY TO SELF", "HIGH RISK OF INJURY TO OTHERS", and which further indicates "Restraints applied due to self-injurious behavior and physical aggression."

59. As indicated in the Silver Cross Hospital ED Physician Documentation, LAUREN remained confined in the 5-point leather restraints for a full two hours and 27 minutes.

- 10 -

60.     Prior to November 23, 2010, LAUREN had never been placed in restraints at any time during the course of her mental health treatments.

61.     Prior to November 23, 2010, LAUREN had never exhibited physical aggression at any time during the course of her mental health treatments.

62.     Prior to November 23, 2010, LAUREN had never exhibited a high risk of injury to others at any time during the course of her mental health treatments.

63.     As a result of being placed in 5-point leather restraints, LAUREN was subjected to extreme bodily confinement and physical immobility, which caused her to experience a substantially heighted degree of emotional distress, mental anguish, anxiety and humiliation.

64.     As indicated in the Silver Cross Hospital ED Physician Documentation, diagnoses by psychiatric medical providers at Silver Cross Hospital ED concerning LAUREN's condition on November 23, 2010, included "suicide gesture" with respect to her acute overdose of zolpidem and "suicidal ideation" as well as "depression, drug dependence and alcohol dependence."

65.     As further indicated in the Silver Cross Hospital ED Physician Documentation, after LAUREN's suicide gesture she was still "having thoughts of suicide. To cut wrists."

66.     As further indicated in the Silver Cross Hospital ED Physician Documentation, LAUREN was "depressed and wants to kill herself by slitting her wrists" and was "confused of why she is here."

67.     As further indicated in the Silver Cross Hospital ED Physician Documentation, LAUREN's "Judgement (sic)/Insight" and "Remote Memory" were "impaired."

- 11 -

68.     As further indicated in the Disposition Summary of the Silver Cross Hospital ED Physician Documentation, LAUREN's condition was diagnosed as resulting from a "Suicide Gesture – Overdose."

69.     On November 24, 2010, LAUREN's parents visited her in the Silver Cross Hospital Emergency Department.  During that visit, LAUREN expressed and exhibited severe emotional distress, mental anguish and anxiety with regard to her overdose/suicide attempt at Timberline Knolls.

70.     Also during that visit, LAUREN acknowledged that "I could have died" as a result of the overdose/suicide attempt, expressing and exhibiting severe emotional distress, mental anguish and anxiety related thereto.

71.     Also during that visit, as LAUREN remained strapped to a gurney the entire time, she expressed and exhibited severe emotional distress, mental anguish, anxiety and humiliation as a result of being physically restrained; and also as a result of having her parents see her in that condition.

72.     Also during that visit, LAUREN expressed and exhibited severe emotional distress, mental anguish, anxiety and humiliation as a result of being told that her condition would require inpatient hospitalization at a different facility, which LAUREN characterized as the "Psych Ward" and which she felt was substantially different than Timberline Knolls, which she characterized as "rehab."

73.     Also during that visit, LAUREN expressed and exhibited severe emotional distress, mental anguish, anxiety and humiliation since she felt that being forced to go to the "Psych Ward" had an adverse social stigma unlike voluntarily going to "rehab" at Timberline Knolls.

74.    Also during that visit, LAUREN expressed and exhibited severe emotional distress, mental anguish, anxiety and humiliation, stating she did not want to be "locked up in the Psych Ward", which she believed to be a cold, uncomfortable and regimented hospital environment, further stating that she would be "surrounded by crazies".

75.    On November 24, 2010, LAUREN was transferred by ambulance from Silver Cross Hospital to Provena St. Joseph Medical Center in Elgin, Illinois, where she remained confined in the Department of Adolescent Psychiatry as an inpatient until November 29, 2010.

76.    While at Provena St. Joseph Medical Center, LAUREN was only allowed to see her parents in a highly structured environment on a very limited basis for two brief visits per day.

77.    During those visits with her parents, LAUREN continued to express and exhibit severe emotional distress, mental anguish, anxiety and humiliation as a result of being "locked up in the Psych Ward"; and she made repeated requests to be transferred back to "rehab" at Timberline Knolls as soon as possible.

78.    In an attempt to minimize the amount of time she would be required to be "locked up in the Psych Ward", LAUREN  responded falsely when asked a number of questions as indicated in the Admission Assessment prepared by personnel at Provena St. Joseph Medical Center.

79.    Said false responses as indicated in the Admission Assessment include, but are not limited to, LAUREN's denial that she had a family history of psychiatric problems despite her knowledge to the contrary; her denial that any family member had committed suicide despite her knowledge that her maternal uncle committed suicide; her denial that she had ever attempted suicide despite her suicide attempt approximately one week before LAUREN's admission to Timberline Knolls; her denial that she had current suicidal ideation despite numerous admissions

and medical records to the contrary; and her denial that she had previously been assaulted despite her admissions and medical records to the contrary concerning prior sexual assaults.

80.     Notwithstanding LAUREN's attempts to respond falsely with regard to her mental condition and history, said Admission Assessment indicates the "Clinician's Appraisal of Patient's Reliability" was determined to be "Questionable Trustworthy", and instead indicates a clinical determination that at the time of her admission LAUREN was still "Suicidal"; further indicates "Suicide Plan • Actual Plan With Access"; and further indicates "Total Suicide/Self Harm Score • 5.

81.     According to the Mental Health Interdisciplinary Plan Problem List which was prepared by personnel at Provena St. Joseph Medical Center shortly after LAUREN's admission, her primary problem was "Destructive Behavior Directed at Self or Others as Manifested by: Suicidal ideas, plans, gestures, attempts. . . "

82.     The results of LAUREN's initial psychiatric examination at Provena St. Joseph Medical Center determined that LAUREN "has a mental illness or emotional disturbance of such severity that hospitalization is necessary" and that she "wants to hurt herself by cutting her wrists."

83.     Medical providers at Provena St. Joseph Medical Center determined that LAUREN's condition was severe enough to require "Suicide Precautions" in the form of "Close Observation", which Close Observations were performed and documented by chart entries every 15 minutes a total of 473 times throughout LAUREN's inpatient hospitalization from November 24, 2010, until her discharge on November 29, 2010.

84.     LAUREN's mental condition was frequently evaluated by Provena St. Joseph Medical Center personnel based upon a "Suicide/Self-Harm Assessment Tool" that utilizes

standardized criteria applied to a patient's observed behavior, which is then quantified to determine the patient's risk level for a potential suicide attempt or act of self-harm.

85.     During the entire duration of LAUREN's inpatient care in the Department of Adolescent Psychiatry at Provena St. Joseph Medical Center, her "Suicide/Self-Harm" score consistently remained between 4 and 6, which constitutes a "Moderate Risk" level.

86.     As indicated by frequent entries by Provena St. Joseph Medical Center personnel in "Psych Initial Shift Assessments", LAUREN also exhibited "Severe Impairment" to both "Judgment" and "Insight."

87.     Said severe impairment to insight was also confirmed in Nurses Notes prepared by Provena St. Joseph Medical Center personnel which indicate, "PATIENT HAS EXTREMELY POOR INSIGHT" and "INSIGHT WAS EXTREMELY POOR".

88.     The morning of her discharge on November 29, 2010, LAUREN's "Psych Initial Shift Assessment" still indicated: "Precautions . Suicide", and the Nurse's Final Discharge Notes indicate LAUREN's "Suicide/Self-Harm" score was still a 5.

89.     On November 12, 2010, eleven days prior to her overdose/suicide attempt on November 23, 2010, LAUREN had a delusion that she was already dead, as indicated in a Shift Clinical Note prepared by Timberline Knolls personnel which states, "This morning, resident shared with staff and peers that 'everyone is dead' (including her) and that she feels out of her body. She told one peer that she is 'invisible.' Resident was given support and seen by therapist."

90.     Given LAUREN's recent suicide attempt, frequent suicidal ideation, history of self-harm, recent delusional thinking, high degree of impulsivity, severely impaired judgment and severely impaired insight on November 23, 2010, it is extremely likely that LAUREN would

have taken all of the zolpidem that was given to her by the other patient regardless of quantity, up to and including a lethal dosage.

91.     LAUREN's statements to Silver Cross Hospital ED personnel asking if any of the other Oak Lodge patients had died indicate that LAUREN believed the other patients may have taken a lethal dosage; further indicates that at the time LAUREN ingested the zolpidem she did not know that the dosage was nonlethal; and further indicates that LAUREN would have taken a lethal dosage if a sufficient amount of zolpidem would have been given to her by the other patient who brought the zolpidem onto the Oak Lodge premises.

92.     LAUREN's statement to her parents on November 24, 2010, acknowledging "I could have died" further indicates that, in fact, she would have taken a lethal dosage if a sufficient amount of zolpidem would have been given to her by the other patient.

93.     At all relevant times referenced herein, TIMBERLINE KNOLLS was an "Accredited Organization" pursuant to criteria established by The Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

94.     As a result of said status as a JCAHO Accredited Organization, TIMBERLINE KNOLLS was at all relevant times reference herein required to comport with all rules, regulations and standards of JCAHO as applied to such accreditation in order to maintain "deemed status."

95.     Said "deemed status" as a JCAHO Accredited Organization is required of all mental health facilities pursuant to Illinois law.

96.     The "deemed status" maintained by JCAHO Accredited Organizations results in a lower level of scrutinizing of a mental health facility by the Illinois Depart of Human Services

with respect to administrative and program monitoring requirements; other facility or program certification/licensure requirements; and onsite compliance review visits.

97.     On November 23, 2010, a "Sentinel Event" was defined by criteria established by JCAHO as, "an unexpected occurrence involving death or serious physical or psychological injury, or the risk thereof . . . . The phrase 'or the risk thereof' includes any process variation for which a recurrence would carry a significant chance of a serious adverse outcome." According to JCAHO, such events are called "sentinel" because they signal the need for immediate investigation and response.

98.     As of January, 2015, a "Sentinel Event" is defined by JCAHO as a "patient safety event" including one that results in "severe temporary harm", further defined as "critical, potentially life-threatening harm lasting for a limited time with no permanent residual, but requires transfer to a higher level of care/monitoring for a prolonged period of time."

99.     LAUREN's overdose/suicide attempt on November 23, 2010, constitutes a "Sentinel Event" whether defined by JCAHO criteria established at that time or currently.

100.    The occurrence of multiple overdoses by six patients, including LAUREN, at Timberline Knolls on November 23, 2010, constitutes a "Sentinel Event" whether defined by JCAHO criteria established at that time or currently.

101.    The JCAHO Sentinel Event Policy and Procedures "strongly encourages" an Accredited Organization to self-report Sentinel Events to JCAHO for a number of reasons, including the fact that "Reporting raises the level of transparency in the organization and promotes a culture of safety"; "Reporting conveys the health care organization's message to the public that it is doing everything possible, proactively, to prevent similar patient safety events in the future"; and "Reporting the event enables 'lessons learned' from the event to be added to The

Joint Commission's Sentinel Event Database, thereby contributing to the general knowledge about sentinel events and to the reduction of risk for such events."

102.     TIMBERLINE KNOLLS did not report the Sentinel Event to JCAHO concerning the incident that occurred on November 23, 2010 when six adolescent girls who were patients at Timberline Knolls, including LAUREN, were transported to various hospital emergency rooms in the local area after ingesting zolpidem at Timberline Knolls.

## COUNT I.  BREACH OF STATUTORY DUTY
(Against Defendants, TIMBERLINE KNOLLS, LLC now known as
R.M. BROWN ENTERPRISES, LLC, KIMBERLY D. DENNIS, M.D.,
SEMONE M. WEST, M.D., and THOMAS DATTALO)

103.     Plaintiff refers to and incorporates by reference each and every allegation contained in Paragraphs 1 – 102 as if fully set forth herein.

104.     At all relevant times referenced herein, Defendants, and each of them, were subject to the provisions of, and had a duty to maintain compliance with, all statutory laws, rules and regulations applicable to LAUREN's treatment at Timberline Knolls, including but not limited to, all rules and regulations promulgated by the Illinois Department of Human Services applicable to the business conducted at Timberline Knolls; the Illinois Mental Health and Developmental Disabilities Code (405 ILCS 5/); The Illinois Protection and Advocacy for Mentally Ill Persons Act (405 ILCS 45/); and The Protection and Advocacy for Individuals with Mental Illness Act of 1986, as amended, 42 USC § 10801, et seq.,  P.L. 106-310.

105.     Pursuant to rules and regulations promulgated by the Illinois Department of Human Services, TIMBERLINE KNOLLS was required to report the incident that occurred on November 23, 2010 when six adolescent girls who were patients at Timberline Knolls, including

LAUREN, were transported to various hospital emergency rooms in the local area after ingesting

zolpidem at Timberline Knolls.

106.    During an onsite compliance review visit to Timberline Knolls by the Illinois

Department of Human Services shortly after November 23, 2010, TIMBERLINE KNOLLS

failed to report the incident that occurred on November 23, 2010 as alleged herein to the Illinois

Department of Human Services.

107.    After said onsite compliance review visit, TIMBERLINE KNOLLS continued in

its failure to report the incident that occurred on November 23, 2010 as alleged herein to the

Illinois Department of Human Services.

108.    The Illinois Mental Health and Developmental Disabilities Code (hereafter the

"MHDDC") states, in pertinent part:

> "Sec. 1-101.1. 'Abuse' means any physical injury, sexual abuse, or mental injury
> inflicted on a recipient of services other than by accidental means. (405 ILCS 5/1-
> 101.1)
>
> Sec. 1-101.2. 'Adequate and humane care and services' means services reasonably
> calculated to result in a significant improvement of the condition of a recipient of
> services confined in an inpatient mental health facility so that he or she may be
> released or services reasonably calculated to prevent further decline in the clinical
> condition of a recipient of services so that he or she does not present an imminent
> danger to self or others. (405 ILCS 5/1-101.2)
>
> . . . .
>
> Sec. 1-117.1. 'Neglect' means the failure to provide adequate medical or personal
> care or maintenance to a recipient of services, which failure results in physical or
> mental injury to a recipient or in the deterioration of a recipient's physical or mental
> condition. (405 ILCS 5/1-117.1)
>
> . . . .
>
> Sec. 1-123. 'Recipient of services' or 'recipient' means a person who has received or
> is receiving treatment or habilitation. (405 ILCS 5/1-123)
>
> . . . .
>
> Sec. 1-129. Mental illness. 'Mental illness' means a mental, or emotional disorder
> that substantially impairs a person's thought, perception of reality, emotional process,
> judgment, behavior, or ability to cope with the ordinary demands of life, but does not
> include a developmental disability, dementia or Alzheimer's disease absent psychosis,

a substance abuse disorder, or an abnormality manifested only by repeated criminal or otherwise antisocial conduct. (405 ILCS 5/1-129)

. . . .

Sec. 2-102. (a) A recipient of services shall be provided with adequate and humane care and services in the least restrictive environment, pursuant to an individual services plan. . . . (405 ILCS 5/2-102(a))

. . . .

Sec. 2-112. Freedom from abuse and neglect. Every recipient of services in a mental health or developmental disability facility shall be free from abuse and neglect." (405 ILCS 5/2-112)

109.    The Illinois Protection and Advocacy for Mentally Ill Persons Act (hereafter the

"PAMIPA", states in pertinent part:

"Sec. 2  Definitions. For the purposes of this Act, the following terms shall have the following meanings unless the context clearly requires otherwise:

(1) 'Mentally ill person' means an individual who has a significant mental illness or emotional impairment as determined by a mental health professional qualified under the laws and regulations of this State and who is receiving care or treatment.

(2) 'Abuse' means any act or failure to act by an employee of a facility rendering care or treatment, which act or failure was performed knowingly, recklessly or with intentional disregard for the rights of a mentally ill person, and which caused, or may have caused, injury to a mentally ill person, and includes but is not limited to acts such as: (1) the rape or sexual assault of a mentally ill person; (2) the striking of a mentally ill person; (3) the use of excessive force when placing a mentally ill person in bodily restraints; and (4) the use of bodily or chemical restraints on a mentally ill person which is not in compliance with federal and State laws and regulations.

(3) 'Neglect' means a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment, which caused or may have caused injury to a mentally ill person or which placed a mentally ill person at risk of injury and includes an act or omission such as failure to establish or carry out an appropriate individual program plan or treatment plan for a mentally ill person; the failure to provide adequate nutrition, clothing or health care to a mentally ill person; or the failure to provide a safe environment for a mentally ill person." (405 ILCS 45/2-1,2,3)

110.    On November 23, 2010, LAUREN was a "recipient of services" as defined in

405 ILCS 5/1-123.

111.    On November 23, 2010, LAUREN suffered from "mental illness" as defined in 405 ILCS 5/1-129.

112.    On November 23, 2010, LAUREN was a "mentally ill person" as defined in 405 ILCS 45/2-1.

113.    Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, failed to design, implement and maintain adequate security measures with respect to preventing the introduction of unauthorized controlled substances onto the Oak Lodge premises on November 23, 2010.

114.    As a result of said failure by Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, to design, implement and maintain adequate security measures, and as a result of the failure by Timberline Knolls personnel to search the other patient who brought the zolpidem onto the Oak Lodge premises on November 23, 2010, as alleged herein, LAUREN ingested a large quantity of zolpidem and suffered an acute overdose which required emergent hospital care and extended confinement in the Department of Adolescent Psychiatry at Provena St. Joseph Medical Center in Elgin, Illinois.

115.    By reason of the acts and omissions of Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, as alleged herein, said Defendants breached their duty to comply with the MHDDC, in that the acts and failures to act of said Defendants as alleged herein resulted in LAUREN's acute overdose of zolpidem and caused LAUREN, as part of her ongoing treatment for mental illness, to be subjected to extreme bodily confinement for two hours and twenty-seven minutes in 5-point leather restraints; to be strapped to a gurney at other times during the course of her emergent treatment at Silver Cross Hospital; and to be confined for five days while hospitalized as an inpatient in the Department of Adolescent Psychiatry at Provena St. Joseph

Medical Center; all of which caused LAUREN to be denied her right to be provided adequate and humane care and services in the least restrictive environment, in violation of 405 ILCS 5/2-102(a).

116.    Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, further breached their duty to comply with the MHDDC by violating LAUREN's right to be free from neglect as that term is defined in 405 ILCS 5/1-117.1, in that said Defendants failed to provide adequate medical care, personal care and maintenance to LAUREN as a recipient of services, which failure resulted in physical and mental injury to LAUREN and further resulted in the deterioration of LAUREN's physical and mental condition, all in violation of 405 ILCS 5/2-112.

117.    Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, further breached their duty to comply with the MHDDC by violating LAUREN's right to be free from abuse as that term is defined in 405 ILCS 5/1-101.1, in that LAUREN sustained physical and mental injuries other than by accidental means at Timberline Knolls, all in violation of 405 ILCS 5/2-112.

118.    Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, breached said Defendants' duty to comply with the PAMIPA given that said Defendants were responsible for providing services which caused or may have caused injury to LAUREN as a mentally ill person, or which placed LAUREN at risk of injury, resulting from said Defendants' failure to provide a safe environment for a mentally ill person, all in violation of 405 ILCS 45/2-3).

119.    Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, further breached said Defendants' duty to comply with the PAMIPA as a result of their acts and failures to act as alleged herein, which acts and failures were performed recklessly and with intentional disregard for LAUREN'S rights as mentally ill person, and which caused, or may have caused,

injury to LAUREN, all of which constitutes abuse pursuant to the definition of that term in 405 ILCS 45/2-2.

120.     None of the acts or failures to act by Defendants, TIMBERLINE KNOLLS, DENNIS and DATTALO, that breached their statutory duties as alleged herein required or involved the exercise of medical judgment.

121.     After LAUREN's overdose/suicide attempt on November 23, 2010, the failures and overt refusals by Defendant, WEST, to communicate with LAUREN's other mental health care providers; WEST's failures and overt refusals to facilitate LAUREN's treatment by said other mental health care providers; and WEST's failures and overt refusals to provide WEST's own mental health treatment, all as alleged hereinbelow, did not require or involve the exercise of medical judgment, and was instead the result of WEST placing the legal and financial interests of herself and of TIMBERLINE KNOLLS ahead of LAUREN's need for medical care.

122.     As a result of WEST's acts and failures to act as alleged hereinbelow, WEST breached her duty to comply with the MHDDC by failing to provide adequate care and services to LAUREN in violation of 405 ILCS 5/2-102(a).  Said failure did not require or involve the exercise of medical judgment.

123.     Defendant, WEST, further breached her duty to comply with the MHDDC by violating LAUREN's right to be free from neglect as that term is defined in 405 ILCS 5/1-117.1, in that WEST failed to provide adequate medical care, personal care and maintenance to LAUREN as a recipient of services, which failure resulted in physical and mental injury to LAUREN and further resulted in the deterioration of LAUREN's physical and mental condition, all in violation of 405 ILCS 5/2-112.  Said failure did not require or involve the exercise of medical judgment.

124.     Defendant, WEST, breached her duty to comply with the PAMIPA given that WEST was responsible for providing services which caused or may have caused injury to LAUREN as a mentally ill person, or which placed LAUREN at risk of injury, resulting from WEST's failure to carry out an appropriate individual program plan or treatment plan for a mentally ill person, all in violation of 405 ILCS 45/2-3). Said failure did not require or involve the exercise of medical judgment.

125.     Defendant, WEST, further breached her duty to comply with the PAMIPA as a result of her failures to act as alleged herein, which failures were performed recklessly and with intentional disregard for LAUREN'S rights as mentally ill person, and which caused, or may have caused, injury to LAUREN, all of which constitutes abuse pursuant to the definition of that term in 405 ILCS 45/2-2. Said failures did not require or involve the exercise of medical judgment.

126.     The conduct of Defendants, TIMBERLINE KNOLLS, DENNIS, WEST and DATTALO, as alleged herein was extreme and outrageous.

127.     The conduct of Defendants, TIMBERLINE KNOLLS, DENNIS, WEST and DATTALO, as alleged herein was willful and wanton in that it shows an utter indifference to or conscious disregard for LAUREN's safety and well-being; and the safety and well-being of others.

128.     As a result of the acts and failures to act of Defendants, TIMBERLINE KNOLLS, DENNIS, WEST and DATTALO, as alleged herein, LAUREN has sustained damages with regard to medical expenses, physical injury, mental injury, deterioration of physical and mental condition, pain, suffering, emotional distress, mental anguish, humiliation, temporary loss of normal life and other damages.

- 24 -

## COUNT II. BREACH OF FIDUCIARY DUTY
(Against Defendant, SEMONE M. WEST, M.D.)

129. Plaintiff refers to and incorporates by reference each and every allegation contained in Paragraphs 1 –128 as if fully set forth herein.

130. By virtue of the special relationship between WEST, as a physician, and LAUREN, as her patient, at all relevant times referenced herein WEST owed a fiduciary duty to LAUREN whereby WEST was required to act in the highest good faith and in the best interests of LAUREN with respect to the medical care provided by WEST to LAUREN.

131. Said fiduciary duty required WEST at all times to comply at all times with the ethical standards of the medical profession as published in The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry published by the American Psychiatric Association (then-current 2009 Edition).

132. As set forth is said publication, in order to comport with the essentials of honorable behavior for WEST as a physician, WEST was required to regard her responsibility to LAUREN as paramount, and strive to resolve any conflicts with the interests of TIMBERLINE KNOLLS in a manner that was likely to be of greatest benefit to LAUREN.

133. Said fiduciary duty includes a duty of loyalty owed by WEST to LAUREN, which precluded WEST from gaining any benefit for herself at expense of her patient, LAUREN.

134. Said fiduciary duty granted an affirmative right to LAUREN to rely upon WEST to comply at all times with the ethical standards of the medical profession, to faithfully perform all obligations imposed thereby and to otherwise act at all times in accordance with said fiduciary duty with respect to the medical care provided by WEST to LAUREN.

135. In accordance with said fiduciary duty, LAUREN placed her trust and confidence in WEST to act in the highest good faith and in the best interests of LAUREN with respect to the medical care provided by WEST to LAUREN.

136. WEST was aware and had actual knowledge of LAUREN's overdose/suicide attempt at Timberline Knolls less than two hours after it occurred, in that WEST countersigned Physician's Orders dated November 23, 2010, at 9:30 p.m. indicating: "Send resident to ER via 911/ambulance for evaluation possible overdose."

137. As of 8:52 a.m. on November 24, 2010, WEST had not contacted anyone at Silver Cross Hospital to inquire about LAUREN's condition; to offer consultation or other assistance concerning LAUREN's emergent medical care; to make arrangements for WEST to provide psychiatric treatment for LAUREN; or to otherwise minimally check on LAUREN in any manner.

138. At 8:52 a.m. on November 24, 2010, personnel in the Psychiatric Department at Silver Cross Hospital paged WEST in an attempt to inform WEST concerning LAUREN's condition; to engage in consultations with WEST concerning LAUREN's suicide attempt; and to otherwise communicate with WEST concerning LAUREN's psychiatric care.

139. The Silver Cross Hospital ED Physician Documentation indicates that on November 24, 2010 at 9:42 a.m., "No return phone call from Dr. West" and that Silver Cross Hospital ED personnel made an additional attempt to contact WEST at that time via telephone call placed to Timberline Knolls, during which call DeDONATO had a discussion with said personnel as alleged hereinbelow.

140. LAUREN was discharged from the Silver Cross Hospital Emergency Department at 3:16 p.m. on November 24, 2010.

141.    At no time prior to LAUREN's discharge from the Silver Cross Hospital

Emergency Department did WEST ever respond to the page that had been placed by personnel in

the Psychiatric Department at 8:52 a.m. on November 24, 2010.

142.    At no time during LAUREN's treatment at Silver Cross Hospital did WEST ever

return the phone call placed by Emergency Department personnel at 9:42 a.m. on November 24,

2010.

143.    Plaintiff is informed and believes and thereon alleges that, during the entire time

LAUREN obtained treatment at Silver Cross Hospital, WEST never contacted anyone at that

facility to inquire about LAUREN's condition; to offer consultation or other assistance

concerning LAUREN's overdose/suicide attempt and corresponding emergent medical care, to

make arrangements for WEST to provide psychiatric treatment for LAUREN in conjunction with

the medical care being provided by Silver Cross Hospital; or to otherwise minimally check on

LAUREN in any manner.

144.    Wajid A. Khan, M.D., was LAUREN's Treating Psychiatrist while she was

confined in the Department of Adolescent Psychiatry at Provena St. Joseph Medical Center.

145.    As indicated in the Psychiatric Evaluation Report dictated by Dr. Khan on

November 25, 2010, "The patient [LAUREN] has been seeing Dr. Simon (sic) West at

Timberline Knolls . . . . I called Dr. Simon at [telephone number redacted by Plaintiff]. The

other number is [telephone number redacted by Plaintiff]. Still waiting for her to call back."

146.    WEST never returned said phone call from Dr. Khan as alleged herein.

147.    Plaintiff is informed and believes and thereon alleges that, during the entire

duration of LAUREN's inpatient hospitalization at Provena St. Joseph Medical Center when her

condition was at all times severe enough to require "Suicide Precautions" in the form of "Close

Observation" a total of 473 times over a period of five days, WEST never contacted Dr. Khan or anyone else at that facility even one time to inquire about LAUREN's condition; to offer consultation or other assistance concerning LAUREN's overdose/suicide attempt and corresponding medical care, to make arrangements for WEST to provide psychiatric treatment for LAUREN in conjunction with the medical care being provided by Provena St. Joseph Medical Center; or to otherwise minimally check on LAUREN in any manner.

148. On November 26, 2010, LAUREN's father called Timberline Knolls to determine what needed to be done in order for LAUREN to be transferred from Provena St. Joseph Medical Center back to Timberline Knolls, and was told by Timberline Knolls personnel that a transfer would not happen unless and until a consultation occurred between M.D.'s (psychiatrists) from Provena St. Joseph Medical Center and Timberline Knolls; and that a discussion between LAUREN and her therapist at Timberline Knolls must also take place prior to any transfer.

149. On November 27, 2010, Provena St. Joseph Medical Center personnel informed LAUREN's father that LAUREN's condition had stabilized to the extent that she could be transferred back to Timberline Knolls. LAUREN'S father then asked that a psychiatrist contact WEST so that the requisite consultation between M.D.'s could take place as expediently as possible. LAUREN's father then also called Timberline Knolls and requested that WEST be contacted and asked to place the requisite call to Provena St. Joseph Medical Center so that the consultation between M.D.'s could take place as expediently as possible.

150. WEST had not placed the requested call to Provena St. Joseph Medical Center by late afternoon on November 27, 2010.

151. Accordingly, LAUREN's father called Timberline Knolls again in the late afternoon on November 27, 2010, and attempted to speak to WEST, however, Timberline Knolls

personnel refused to transfer the call to WEST. LAUREN's father then requested that a message be given to WEST stating that LAUREN's condition had stabilized to the extent that she could be transferred back to Timberline Knolls, and that WEST needed to contact Provena St. Joseph Medical Center so that the required consultation between M.D.'s could occur.

152.    WEST had not placed the requested call to Provena St. Joseph Medical Center by late afternoon on November 28, 2010.

153.    Accordingly, LAUREN's father called Timberline Knolls again in the late afternoon on November 28, 2010, and repeated his request to speak to WEST, however, Timberline Knolls personnel again refused to transfer the call to WEST. LAUREN's father then reiterated his request that a message be given to WEST stating that LAUREN's condition had stabilized to the extent that she could be transferred back to Timberline Knolls, and that WEST needed to contact Provena St. Joseph Medical Center so that the required consultation between M.D.'s could occur.

154.    WEST still had not placed the requested call to Provena St. Joseph Medical Center by 10:00 a.m. on November 29, 2010, as indicated in the Nurse Notes which state, "WE HAVE WORKED ON GETTING THIS PATIENT TRANSFERRED BACK TO TIMBER (sic) KNOLLS. . . . MARGIE GAVE ME PHONE NUMBERS. I TRIED FOR OVER AN HOUR TO REACH HER PSYCHIATRIST DR. WEST AT [telephone number redacted by Plaintiff] WITH NO RESPONSE. PAT RICE PCM SPOKE WITH TIMBER (sic) KNOLLS TO INFORM THAT ANOTHER DOCTOR NEEDS TO BE CALLED."

155.    As further indicated in the Provena St. Joseph Medical Center Nurse Notes at 12:30 p.m. on November 29, 2010, "DR. KHAN WAS PROVIDED THE CELL PHONE NUMBER OF THE OTHER PSYCHIATRIST TO COMPLETE THE MD TO MD."

156. LAUREN was eventually discharged from Provena St. Joseph Medical Center at approximately 1:55 p.m. on November 29, 2010, and transferred back to Timberline Knolls.

157. By virtue of the acts and failures to act of WEST as alleged herein, WEST repeatedly breached her fiduciary duty to LAUREN, including but not limited to:

    a) WEST's failure to contact anyone at Silver Cross Hospital to inquire about LAUREN's condition at any time during the course of LAUREN's treatment at that facility;

    b) WEST's failure to offer information, consultation or other assistance to Silver Cross Hospital personnel concerning LAUREN's overdose/suicide attempt and corresponding medical care;

    c) WEST's failure to make arrangements with Silver Cross Hospital to provide psychiatric treatment for LAUREN in conjunction with her emergent medical care;

    d) WEST's failure to visit LAUREN or to otherwise minimally check on LAUREN in any manner at any time while LAUREN was at Silver Cross Hospital;

    e) WEST's failure to respond to the page from personnel in the Psychiatric Department at Silver Cross Hospital at 8:52 a.m. on November 24, 2010;

    f) WEST's failure to return the call from Silver Cross Hospital at 9:42 a.m. on November 24, 2010.

    g) WEST's failure to contact anyone at Provena St. Joseph Medical Center to inquire about LAUREN's condition at any time during the five-day course of LAUREN's treatment at that facility;

h) WEST's failure to offer information, consultation or other assistance to Provena St. Joseph Medical Center personnel concerning LAUREN's overdose/suicide attempt and corresponding medical care;

i) WEST's failure to make arrangements with Provena St. Joseph Medical Center to provide psychiatric treatment for LAUREN in conjunction with the medical care being provided by Provena St. Joseph Medical Center;

j) WEST's failure to visit LAUREN or to otherwise minimally check on LAUREN in any manner at any time during the five days while LAUREN was an inpatient in the Department of Adolescent Psychiatry at Provena St. Joseph Medical Center;

k) WEST's failure to return the call(s) from Wajid A. Kahn, M.D., including but not necessarily limited to, the call placed by Dr. Kahn to WEST on November 25, 2010;

l) WEST's failure to return the calls or otherwise respond to the messages from LAUREN's father on November 27, 2010 and November 28, 2010, regarding the status of LAUREN's condition and corresponding need for a consultation between M.D.'s so that LAUREN could be discharged from the Department of Adolescent Psychiatry at Provena St. Joseph Medical Center and transferred back to Timberline Knolls; and

m) WEST's failure to return the calls or otherwise respond to the messages from nursing personnel at Provena St. Joseph Medical Center on November 29, 2010, regarding the status of LAUREN's condition and corresponding need for a consultation between M.D.'s so that LAUREN could be discharged from

the Department of Adolescent Psychiatry at Provena St. Joseph Medical

Center and transferred back to Timberline Knolls.

158.    Said repeated breaches of WEST's fiduciary duty to LAUREN resulted in a

diminishment in the quality of medical care provided to LAUREN following her

overdose/suicide attempt on November 23, 2010.

159.    If WEST had acted in accordance with her fiduciary duty to LAUREN, WEST

would have communicated with the medical care providers at Silver Cross Hospital and Provena

St. Joseph Medical Center in order to facilitate and enhance LAUREN's care at those facilities.

Said fiduciary duty required that WEST initiate contact with those other medical care providers

and also respond to their attempts to communicate with her.

160.    Given WEST's detailed knowledge concerning LAUREN's history of mental

illness and WEST's treatment of that mental illness, said communication with WEST would

have facilitated and enhanced LAUREN's treatment.  Further, said communication would have

been particularly valuable to those other medical care providers given LAUREN's confusion as

to why she was being treated and her impairments to judgment, insight and remote memory, as

diagnosed by those providers.

161.    If WEST had acted in accordance with her fiduciary duty to LAUREN, WEST

would have attempted to provide her own psychiatric treatment in conjunction with LAUREN's

overall medical treatment from November 23, 2010 through November 29, 2010, or would have

at least visited LAUREN during that time, given that continuity of care, to the extent possible,

was in LAUREN'S best medical interests.

162.    Due to LAUREN's recent suicide attempt just prior to being admitted to

Timberline Knolls, and due to LAUREN's diagnoses and symptomatology with respect to her

mental condition, Defendants, WEST and TIMBERLINE KNOLLS, knew or should have known that LAUREN's overdose on November 23, 2010, was a suicide attempt, or was possibly a suicide attempt.

163.    Despite WEST's knowledge that LAUREN's overdose/suicide attempt on November 23, 2010, occurred while LAUREN was a patient under WEST's care, and despite WEST's knowledge that said overdose/suicide attempt occurred at the Timberline Knolls premises where WEST was employed as a Treating Psychiatrist, and despite WEST's knowledge that LAUREN's best interests required WEST to communicate with LAUREN's medical providers following her overdose/suicide attempt with respect to LAUREN's emergent treatment at Silver Cross Hospital and inpatient psychiatric treatment at Provena St. Jospeh Medical Center, WEST nevertheless overtly failed and refused to initiate communication with those medical providers and failed and refused to respond to their attempts to communicate with WEST.

164.    The acts and failures to act by WEST as alleged herein demonstrate that WEST totally abandoned her patient, LAUREN, during the time of LAUREN's most urgent need for psychiatric care in the hours and days following her overdose/suicide attempt committed at Timberline Knolls while under the care of WEST.

165.    Plaintiff is informed and believes and thereon alleges that WEST failed and refused to communicate with LAUREN's medical care providers at Silver Cross Hospital and Provena St. Joseph Medical Center in an attempt to implement damage control with regard to liabilities and financial exposures created by LAUREN's overdose/suicide attempt while under the care of WEST at Timberline Knolls.

166.    Plaintiff is informed and believes and thereon alleges that WEST failed and refused to communicate with other medical care providers with respect to their treatment of the other five adolescent patients following the multiple overdoses at Timberline Knolls on November 23, 2010, as alleged herein, in an attempt to implement damage control measures with regard to liabilities and financial exposures created by said multiple overdoses at Timberline Knolls.

167.    As a result of the acts and failures to act by WEST as alleged herein, WEST placed the legal and financial interests of herself and TIMBERLINE KNOLLS ahead of LAUREN's best interests with regard LAUREN's medical care.

168.    WEST's repeated failures and refusals to respond to the requests for a consultation between M.D.'s resulted in LAUREN being forced to remain confined in the Department of Adolescent Psychiatry at Provena St. Joseph Medical Center for an additional two days after November 27, 2010, when her condition had stabilized to the extent that she could have been transferred back to Timberline Knolls.

169.    None of the conduct by WEST as alleged herein required or involved the exercise of medical judgment.

170.    Said conduct of WEST as alleged herein was extreme and outrageous.

171.    Said conduct of WEST as alleged herein was willful and wanton in that it showed an utter indifference to or conscious disregard for LAUREN's safety and well-being; and the safety and well-being of others.

172.    By engaging in the conduct as alleged herein, WEST recklessly and consciously disregarded the probability of causing a diminishment in the quality of LAUREN's medical care following her overdose/suicide attempt on November 23, 2010.

173.     As a result of the acts and failures to act of WEST as alleged herein, LAUREN

has sustained damages with regard to medical expenses, mental injury, deterioration of physical

and mental condition, pain, suffering, emotional distress, mental anguish, humiliation, temporary

loss of normal life and other damages.

## COUNT III.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against Defendant, R.M. BROWN ENTERPRISES, LLC f/k/a TIMBERLINE KNOLLS, LLC)

174.     Plaintiff refers to and incorporates by reference each and every allegation

contained in Paragraphs 1 – 173 as if fully set forth herein.

175.     Plaintiff is informed and believes and thereon alleges that Timberline Knolls

management personnel instructed or otherwise requested WEST to not communicate with

LAUREN's medical care providers at Silver Cross Hospital and/or Provena St. Joseph Medical

Center given the desire of TIMBERLINE KNOLLS to implement damage control with regard to

liabilities and financial exposures created by LAUREN's overdose/suicide attempt while under

the care of Timberline Knolls.

176.     Plaintiff is informed and believes and thereon alleges that WEST's failure and

refusal to communicate with LAUREN's medical care providers at Silver Cross Hospital and/or

Provena St. Joseph Medical was caused by said instruction or request by Timberline Knolls

management personnel, or was concurrently caused thereby in conjunction with WEST's own

desire for damage control with regard to liabilities and financial exposures created by

LAUREN's overdose/suicide attempt while under her care at Timberline Knolls.

177.     As a result of the acts of TIMBERLINE KNOLLS as alleged herein,

TIMBERLINE KNOLLS placed the legal and financial interests of TIMBERLINE KNOLLS

ahead of LAUREN's need for medical care.

178.     As a result of the acts and failures to act of TIMBERLINE KNOLLS as alleged herein, TIMBERLINE KNOLLS knowingly and substantially provided assistance, aided and abetted WEST in breaching WEST's fiduciary duty to LAUREN.

179.     TIMBERLINE KNOLLS was regularly aware of its role as part of the breach of fiduciary duty at the time that TIMBERLINE KNOLLS provided said assistance, aid and abetment.

180.     Said conduct of TIMBERLINE KNOLLS as alleged herein was extreme and outrageous.

181.     Said conduct of TIMBERLINE KNOLLS as alleged herein was willful and wanton in that it shows actual or deliberate intention to harm, and otherwise shows an utter indifference to or conscious disregard for LAUREN's safety and well-being.

182.     As a result of the acts and failures to act of TIMBERLINE KNOLLS as alleged herein, LAUREN has sustained damages with regard to medical expenses, physical injury, mental injury, deterioration of physical and mental condition, pain, suffering, emotional distress, mental anguish, temporary loss of normal life and other damages.

## COUNT IV.  TORTIOUS INTERFERENCE WITH PHYSICIAN-PATIENT RELATIONSHIP
(Against Defendants, TIMBERLINE KNOLLS and MARK DeDONATO )

183.     Plaintiff refers to and incorporates by reference each and every allegation contained in Paragraphs 1 – 182 as if fully set forth herein.

184.     The Silver Cross Hospital ED Physician Documentation indicates that on November 24, 2010 at 9:42 a.m. an attempt was made by Silver Cross Hospital ED personnel to contact WEST via a telephone call placed to Timberline Knolls, stating "Call placed to Mark

- 36 -

Denado (sic) at Timberline Knolls. Mark states that they are all currently in a conference and he will have Dr. West call when they are finished."

185.    Plaintiffs are informed and believe and thereon allege that the primary subject matter of the conference at Timberline Knolls referred to by DeDONATO during said phone call revolved around the multiple overdose of Timberline Knolls patients that occurred the night before, including LAUREN; and that the purpose of the conference was to implement a strategy designed to effect damage control with regard to liabilities and financial exposures created thereby.

186.    The telephone call placed by Silver Cross Hospital Emergency Department personnel to DeDONATO at Timberline Knolls on November 24, 2010 at 9:42 a.m. as alleged herein was answered by DeDONATO.

187.    At the time of said telephone call, DeDONATO knew that the purpose of that call was an attempt by Silver Cross Hospital Emergency Department personnel to inform WEST concerning LAUREN's condition; to obtain information and/or engage in consultations with WEST concerning LAUREN's suicide attempt by overdose; and to otherwise communicate with WEST concerning LAUREN's medical care.

188.    As Director of Continuing Care at Timberline Knolls, DeDONATO had specialized knowledge and experience with regard to the high degree of importance to a patient's well-being placed on treatment received by those patients outside of the short-term care provided by Timberline Knolls.

189.    During said telephone call, Silver Cross Hospital Emergency Department personnel requested that DeDONATO relay the call to WEST or otherwise undertake measures so that they could speak to WEST during the call.

- 37 -

190.     Despite DeDONATO's knowledge concerning the purpose of said telephone call, and despite DeDONATO's specialized knowledge concerning the importance of the call to LAUREN's well-being, DeDONATO intentionally and overtly refused to comply with the request.

191.     Plaintiffs are informed and believe and thereon allege that DeDONATO refused to comply with said request because WEST was attending the damage control conference at the time of the call, which attendance was deemed by DeDONATO to be more important than the purpose of the call as aforesaid.

192.     As a result of the acts and failures to act of DeDONATO as alleged herein, DeDONATO placed the legal and financial interests of Timberline Knolls ahead of LAUREN's need for medical care.

193.     As a result of the acts and failures to act of DeDONATO as alleged herein, DeDONATO knowingly interfered with the physician-patient relationship between WEST and LAUREN.

194.     As a result of the acts of TIMBERLINE KNOLLS as alleged hereinabove, that Timberline Knolls management personnel instructed or otherwise requested WEST to not communicate with LAUREN's medical care providers at Silver Cross Hospital and/or Provena St. Joseph Medical Center, TIMBERLINE KNOLLS knowingly interfered with the physician-patient relationship between WEST and LAUREN, placing the legal and financial interests of TIMBERLINE KNOLLS ahead of LAUREN's need for medical care.

195.     Said conduct of DeDONATO and TIMBERLINE KNOLLS as alleged herein was extreme and outrageous.

196.    Said conduct of DeDONATO and TIMBERLINE KNOLLS as alleged herein was

willful and wanton in that it shows actual or deliberate intention to harm, and otherwise shows an

utter indifference to or conscious disregard for LAUREN's safety and well-being.

197.    As a result of the acts of DeDONATO and TIMBERLINE KNOLLS as alleged

herein, LAUREN has sustained damages with regard to medical expenses, physical injury,

mental injury, deterioration of physical and mental condition, pain, suffering, emotional distress,

mental anguish, temporary loss of normal life and other damages.

### COUNT V.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(Against Defendants, TIMBERLINE KNOLLS, LLC now known as R.M.
BROWN ENTERPRISES, LLC, KIMBERLY D. DENNIS, M.D.,
SEMONE M. WEST, M.D., and THOMAS DATTALO)

198.    Plaintiff refers to and incorporates by reference each and every allegation

contained in Paragraphs 1 – 198 as if fully set forth herein.

199.    From and after November 23, 2010, Defendants, TIMBERLINE KNOLLS,

DENNIS, WEST and DATTALO, knew or should have known that LAUREN was particularly

susceptible to emotional distress because of her mental condition and recent attempt to commit

suicide prior to her treatment at Timberline Knolls.

200.    Despite the knowledge of Defendants, TIMBERLINE KNOLLS, DENNIS and

DATTALO, that the adolescent patients residing at Oak Lodge who suffered from mental

disorders related to substances were at a significantly heightened risk with respect to the

potential for substance abuse or misuse and the dangers to mind and body associated therewith,

and despite the knowledge of said Defendants that it was more likely than not that some of the

patients residing at Oak Lodge would attempt to bring controlled substances onto the premises at

some point during said residency, and despite the knowledge of said Defendants that previous

attempts had been made by patients residing at Oak Lodge to bring controlled substances onto

the Oak Lodge premises, said Defendants nevertheless failed to design, implement and maintain

security measures that were adequate to prevent the introduction of unauthorized controlled

substances onto the Oak Lodge premises, with the result that a patient residing at Oak Lodge was

not searched at the time of her re-entry on the premises on November 23, 2010, with the further

result that said patient did in fact bring unauthorized controlled substances onto the Oak Lodge

premises that were ingested by LAUREN in an attempt to commit suicide.

201.     Despite the knowledge of Defendant, WEST, concerning LAUREN's

overdose/suicide attempt while being treated at Timberline Knolls and that LAUREN was

particularly susceptible to emotional distress because of it, WEST nevertheless failed and refused

to communicate with LAUREN's medical providers at Silver Cross Hospital or Provena St.

Joseph Medical Center; failed to provide information, offer consultation or other assistance to

those other medical providers concerning LAUREN's overdose/suicide attempt and

corresponding medical care; failed to make arrangements to provide psychiatric treatment for

LAUREN in conjunction with her other medical care; and failed to visit LAUREN or to

otherwise minimally check on LAUREN in any manner at any time.

202.     Despite the knowledge of Defendant, TIMBERLINE KNOLLS, concerning

LAUREN's overdose/suicide attempt while being treated at Timberline Knolls and that

LAUREN was particularly susceptible to emotional distress because of it, TIMBERLINE

KNOLLS nevertheless engaged in conduct that aided and abetted a breach fiduciary duty, and

that tortuously interfered with physician-patient relationship as alleged herein.

203.    The conduct of Defendants, TIMBERLINE KNOLLS, DENNIS, WEST and DATTALO, as alleged herein caused LAUREN to suffer severe and extreme emotional distress and mental anguish.

204.    Said conduct of said Defendants as alleged herein was willful and wanton in that it showed an utter indifference to or conscious disregard for LAUREN's safety and well-being; and the safety and well-being of others.

205.    By engaging in the conduct as alleged herein, said Defendants recklessly and consciously disregarded the probability of causing LAUREN to suffer emotional distress.

206.    As a result of the acts and failures to act of said Defendants as alleged herein, LAUREN has sustained damages with regard to medical expenses, physical injury, mental injury, deterioration of physical and mental condition, pain, suffering, emotional distress, mental anguish, humiliation, temporary loss of normal life and other damages.

WHEREFORE, Plaintiff, LAUREN M. HALES, prays for judgment against Defendants, TIMBERLINE KNOLLS, LLC now known as R.M. BROWN ENTERPRISES, LLC, KIMBERLY D. DENNIS, M.D., SEMONE M. WEST, M.D., THOMAS DATTALO and MARK DeDONATO, awarding compensatory damages and punitive damages according to proof, interest thereon as allowed by law, reasonable attorney fees and costs, and such other and further relief as the court deems just and proper.


**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all factual issues in this case.

JAMES A. HALES
Law Offices of JAMES A HALES, PLLC
1703 Koestner Street
Burlington, IA  52601
Telephone: (319) 572-0622
Fax:  (319) 754-4451
jhales@iowalaw.us.com
ATTORNEY FOR PLAINTIFF