IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAUREN M. HALES, ) | |
| ) | |
| Plaintiff, ) | Case No. 1:15-cv-02622 |
| ) | |
| vs. ) | The Honorable Thomas M. Durkin |
| ) | |
| TIMBERLINE KNOLLS, LLC, now known ) | |
| as R.M. BROWN ENTERPRISES, LLC, ) | |
| SEMONE M. WEST, M.D., THOMAS ) | |
| DATTALO and MARK DeDONATO, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' COMBINED
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff, LAUREN M. HALES, (hereafter "Lauren") by and through her attorney, LAW OFFICES OF JAMES A. HALES, PLLC, and submits her brief in opposition to the motion to dismiss Plaintiff's First Amended Complaint filed herein by Defendants, TIMBERLINE KNOLLS, LLC, now known as R.M BROWN ENTERPRISES, LLC, (hereafter "Timberline Knolls") SEMONE M. WEST, M.D. (hereafter "Dr. West"), THOMAS DATTALO (hereafter "Mr. Dattalo) and MARK DeDONATO (hereafter "Mr. DeDonato") (hereafter collectively "Defendants"), and states the following:

**INTRODUCTION**

As set forth more fully in Plaintiff's First Amended Complaint, this action stems from an incident occurring on November 23, 2010 at a mental health facility known as Timberline Knolls when Lauren, who was then fifteen years old, made a repeated attempt to commit suicide by

**EXHIBIT A**

ingesting a large amount of a controlled substance that had been casually brought into the facility by another patient after Timberline Knolls failed to perform even a perfunctory search of that other patient when she returned from an outing with her mother. A total of six adolescent patients, including Lauren, were rushed by ambulance to various Emergency Rooms due to multiple overdoses resulting from that failure. Thereafter, Timberline Knolls personnel, including Lauren's treating psychiatrist, abandoned their patient, refusing to respond to numerous attempts to communicate by medical providers at the ER and at a hospital where Lauren was later transferred and confined to an adolescent psychiatric unit for five days. Lauren languished there unnecessarily for at least two days as a direct result of the psychiatrist's ongoing refusals to respond during the time of her patient's greatest need. As evidenced by introductory statements set forth in the instant motion, Defendants have basically taken a "no harm no foul" approach to this matter and now seek to have the entire complaint dismissed.

## ARGUMENT

### I. The First Amended Complaint Is Sufficiently Pled To Support Lauren's Claim For Breach of Statutory Duty

A claim for breach of statutory duty has long been recognized in Illinois, and is even the subject of a specific Illinois Supreme Court Rule with respect to pleading:

> "Rule 133. Pleading Breach of Statutory Duty; Judgment or Order; Breach of Condition Precedent
>
> (a) Statutory Duty. If a breach of statutory duty is alleged, the statute shall be cited in connection with the allegation." Ill. S. Ct. R. 133.

Defendants' motion asserts that Count I of the First Amended Complaint (against three of the four defendants, not all defendants as indicated in the motion) should be dismissed because the Illinois Mental Health and Developmental Disabilities Code (405 ILCS 5/) ("IMHDDC) "does not expressly provide for a private right of action." As pronounced by the Illinois Supreme Court in *Metzger v. DaRosa*, 805 N.E.2d 1165, 209 Ill.2d 30 (2004), it is well settled in

Illinois that "[t]he lack of specific statutory language granting such a right, however, is not necessarily dispositive because a court may determine that a private right of action is implied in a statute." *Id*. at 1168, citing *Fisher v. Lexington Health Care, Inc*., 188 Ill. 2d 455, 460 (1999); *Rodgers v. St. Mary's Hospital of Decatur*, 149 Ill. 2d 302, 308 (1992); *Sawyer Realty Group, Inc. v. Jarvis Corp*., 89 Ill. 2d 379, 386-87 (1982). The *Metzger* court then cites the *Fisher* decision as reiterating four factors to be considered in determining if a private right of action may be implied from a statute, stating:

> "Implication of a private right of action is appropriate if: (1) the plaintiff is a member of the class for whose benefit the statute was enacted; (2) the plaintiff's injury is one the statute was designed to prevent; (3) a private right of action is consistent with the underlying purpose of the statute; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Fisher*, 188 Ill.2d at 460, 243 Ill.Dec. 46, 722 N.E.2d 1115 (citing *Rodgers,* 149 Ill.2d at 308, 173 Ill.Dec. 642, 597 N.E.2d 616, and *Corgan v. Muehling,* 143 Ill.2d 296, 312-13, 158 Ill.Dec. 489, 574 N.E.2d 602 (1991)).

By alleging that Lauren is a mentally ill person who was subjected to neglect and abuse, there can be no doubt that the First Amended Complaint has satisfied the first two factors. Further, the IMHDDC is replete with statements conferring individual rights that it is designed to protect, thus satisfying the third factor to be considered. In fact, after setting forth a number of definitions in Chapter I of the IMHDDC, <u>Chapter II is devoted entirely to the topic of "RIGHTS OF RECIPIENTS OF MENTAL HEALTH AND DEVELOPMENTAL DISABILITIES SERVICES</u>". 405 ILCS 5/2. For example, Chapter II states: "<u>Every</u> recipient of services in a mental health or developmental disability facility shall be free from abuse and neglect." 405 ILCS 5/2-112 (emphasis provided). And, "A recipient of services shall be provided with adequate and humane care and services . . . . pursuant to an <u>individual services plan</u>. . . ." 405 ILCS 5/2-102(a) (emphasis provided).

Another section within Chapter II states that a mental health patient who performs labor for the provider of services must be paid wages "which are commensurate with the value of the

- 3 -

work performed, in accordance with applicable federal and state laws and regulations." 405 ILCS 5/2-106. Certainly, such a patient would be entitled to invoke this provision of the IMHDDC in seeking a legal remedy to be paid that to which he or she is entitled.

The IMHDDC even codifies the right of a mental health patient to meet with a private attorney (405 ILCS 5/2-103(d)) and if any "attorney advises a facility in which a recipient is receiving inpatient mental health services that he is presently representing the recipient, or has been appointed by any court or administrative agency to do so or has been requested to represent the recipient by a member of the recipient's family, the facility shall . . . disclose to the attorney or advocate whether the recipient is presently residing in the facility and, if so, how the attorney or advocate may communicate with the recipient." 405 ILCS 5/2-114(a). Those two provisions in particular are evidence of legislative intent that mental health patients not be deprived of legal representation to protect their own rights assertively by private right of action through counsel.

With regard to the need for a private right of action in order to provide an adequate remedy for statutory violations, the court in *Metzger* pointed out several aspects of the statute at issue in that case (the Illinois Personnel Code), which spelled out detailed processes to address and provide remedies for violations, including (1) an administrative process through the Civil Service Commission; (2) judicial review of the Civil Service Commission's administrative decisions; (3) authority for the Director of Central Management Services to institute and maintain any action or proceeding to secure compliance with the Personnel Code and its implementing rules and orders; and (4) criminal penalties for violation of any provision of the Personnel Code. *Id*., at 1170. The *Metzger* court thus concluded, "These mechanisms are sufficient to encourage the reporting of violations of the Personnel Code and to prevent and punish retaliatory action against state employees who make such reports." *Id,* at 1171.

In the context of federal law, the U.S. Supreme Court has held, "The presumption that a [private] remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement.'" *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96, 107 (1985), quoting *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 97, 101 S.Ct. 1571, 1583-84, 67 L.Ed.2d 750, 767 (1981). The IMHDDC contains no such integrated system of enforcement procedures, and only contains a few specific administrative procedures and remedies to address expressly limited situations, such as Admission, Transfer and Discharge Procedures (Chapter III). Although Chapter II's codification of separately described individual rights conferred upon mentally ill patients contains a short synopsis of "procedures" in Article II, those procedures are bare bones and even allow such a patient the option of whether or not the Illinois Guardianship and Advocacy Commission ("IGAC") is informed that the patient is receiving mental health services:

> "(c) Upon commencement of services, or as soon thereafter as the condition of the recipient permits, **the facility shall ask the adult recipient or minor recipient . . . whether the recipient wants the facility to contact the** recipient's spouse, parents, guardian, close relatives, friends, attorney, **advocate from the Guardianship and Advocacy Commission** . . . or others and inform them of the recipient's presence at the facility. The facility shall by phone or by mail contact at least two of those people designated by the recipient and shall inform them of the recipient's location. **If the recipient so requests, the facility shall also inform them of how to contact the recipient**." 405 ILCS 5/2-200(c).

Conspicuously absent from Defendants' motion is any argument that the legislature intended the IGAC to be the sole enforcement mechanism and source of remedy for violation of a mental health patient's rights under the IMHDDC. If that were the case, and if such a patient did not affirmatively express a desire to have the facility inform the IGAC of his or her presence in the facility as soon as services are commenced, or inform the IGAC how the patient can be contacted, does that mean that the patient has no remedy to enforce any of the individual rights

set forth so definitively in Chapter II of the IMHDDC?  Clearly, the legislature crafted this statutory scheme to provide the patient with a corollary right to choose whether or not to seek the involvement of the IGAC with respect to the deprivation of substantive rights.

## II. Lauren Has Not Failed To Exhaust Any Prerequisite Administrative Remedies

While the instant motion makes a bare allegation that Lauren has failed to exhaust her administrative remedies, Defendants fail to point to any such administrative remedy that Lauren should have allegedly pursued, and since Lauren's opposition herein responds to the arguments espoused by Defendant's motion, Defendants cannot introduce any new argument in reply to this opposition specifying such a remedy even if it actually existed.

More importantly, Defendants' motion deletes language in the quotation of 42 U.S.C.A. § 10807 that is necessary for proper construction and is grossly misleading to the court. Specifically, Defendants' quote deletes text that specifies the type of entities that are required to exhaust administrative remedies, and individual mental health recipients are not included in that description.  The full text of 42 U.S.C.A. § 10807 states, with the deleted portion highlighted in bold:

> "(a) Prior to instituting any legal action in a Federal or State court <u>on behalf of an individual with mental illness</u>, **an eligible system, or a State agency or nonprofit organization** which entered into a contract with an eligible system under section 10804(a) of this title, shall exhaust in a timely manner all administrative remedies where appropriate. **If, in pursuing administrative remedies, the system, agency, or organization determines that any matter with respect to such individual will not be resolved within a reasonable time, the system, agency, or organization may pursue alternative remedies, including the initiation of a legal action.**
>
> **(b) Subsection (a) of this section does not apply to any legal action instituted to prevent or eliminate imminent serious harm to an individual with mental illness.**"  42 U.S.C.A. § 10807 (emphasis provided).

Thus, the statute is referring to the "system", "State agency" or "nonprofit organization" itself that must exhaust its own administrative remedies where appropriate prior to initiating legal action, unless doing so could cause imminent serious harm to the mentally ill individual.

- 6 -

Notwithstanding the foregoing, Lauren actually did initiate complaint procedures with the IGAC approximately two years ago concerning the allegations against Timberline Knolls and others as framed by the First Amended Complaint, and is informed that the IGAC's investigation is ongoing. Accordingly, even if Lauren's pursuit of an administrative remedy was a condition precedent to filing suit, she has fulfilled that requirement. As for "exhaustion" of remedies, the Complaint herein was necessarily filed very close to expiration of applicable the statutes of limitation, and given the stagnant nature of the IGAC investigation, Lauren cannot be made to have forfeited her cause of action herein simply due to the lack of closure by the IGAC.

### III. The First Amended Complaint Is Not Based On The Illinois Healing Arts Malpractice Act, And 735 ILCS 5/2-622 Does Not Apply

Defendants' motion argues vigorously that Lauren can have no private right of action except for medical malpractice, and that the First Amended Complaint should be dismissed in its entirety since a 735 ILCS 5/2-622 affidavit was not attached to the First Amended Complaint. Lauren's pleadings, however, are straightforward and repeatedly allege that the acts constituting malfeasance by Defendants did not require or involve the exercise of medical judgment. Further, the tortious acts of Defendants as alleged in the First Amended Complaint were so blatant and contrary to the statutory provisions of the IMHDDC that no expert analysis with respect to medical matters, whether related to any standard of care or otherwise, is necessary to prove liability.

The Illinois case of *Chadwick v. Al-Basha*, 692 N.E.2d 390, 295 Ill.App.3d 75 (Ill.App. 2 Dist., 1998), is directly on point and particularly instructive on this topic. The facts are strikingly similar to those alleged in the First Amended Complaint and the issues decided are exactly the same as those presented by the instant motion with respect to 735 ILCS 5/2-622. Just like Lauren, the plaintiff in *Chadwick* brought suit not based on healing art malpractice, but based on statutory violation of the Illinois Mental Health and Disabilities Code. *Id*. at 391. The *Chadwick*

- 7 -

plaintiff filed a five-count complaint alleging theories of liability based on: (1) false imprisonment; (2) battery; (3) assault; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress. Each of these counts specifically alleged that the defendant had violated the IMHDDC. *Id*. at 392. After the trial court dismissed plaintiff's complaint with prejudice for failing to file the supporting attorney's affidavit and physician's report required by 735 ILCS 5/2-622, the appellate court reversed, finding:

> "The plaintiff responded to the motion by arguing that section 2-622 did not apply to her action. Specifically, the plaintiff argued that her complaint did not sound in medical malpractice, but instead sought to collect damages for the defendant's alleged violations of the Mental Health Code discussed above. The plaintiff argued that no expert analysis was required to evaluate the defendant's conduct as he clearly did not follow the procedure required by the Mental Health Code. . . . On appeal, the plaintiff again argues that section 2-622 does not apply to her action because her complaint does not contain any allegations of medical negligence. Instead, the plaintiff argues that her complaint alleges that the defendant failed to comply with the mandatory provisions of the Mental Health Code. The plaintiff argues that the intended purpose of these provisions is to protect the rights of mental health patients and that the defendant's failure to comply with these requirements resulted in a violation of her rights." *Id*.

> " 'Professional misconduct or unreasonable lack of skill [is the] [f]ailure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss or damage to the recipient of those services or to those entitled to rely upon them.' " quoting *Cohen*, 269 Ill.App.3d at 1090, quoting Black's Law Dictionary 959 (6th ed.1990) . . . The essence of the plaintiff's complaint arises out of the defendant's violation of these statutory violations, as opposed to any deviation from the applicable standard of medical care. (citing *Cohen v. Smith*, 269 Ill.App.3d 1087, 1092, 648 N.E.2d 329 (1995). The counts of the plaintiff's complaint do not allege medical negligence, but are instead predicated upon false imprisonment, assault, battery, and infliction of emotional distress. The plaintiff alleges that, by engaging in statutorily prohibited conduct, the defendant caused her to be touched and confined without her consent and without legal authority." *Id*. at 393.

The *Chadwick* court concluded:

> "Regardless of whether the defendant's treatment was medically appropriate, it was nonetheless prohibited under the Mental Health Code. We therefore agree with the plaintiff that the question of whether the defendant violated the provisions of the Mental Health Code does not require a determination of whether the defendant properly exercised his medical judgment. *See Cohen*, 269 Ill.App.3d at 1092, 207 Ill.Dec. 873, 648 N.E.2d 329. As the plaintiff has not alleged that the defendant improperly exercised his professional skill, we conclude that the plaintiff's complaint is not subject to the

- 8 -

requirements of section 2-622 and that the trial court erred in dismissing the plaintiff's complaint on that basis." *Id*. at 394.

Since the nature of a plaintiff's claim determines whether section 2-622 is implicated, the *Cohen* court correctly concluded that section 2-622 did not apply and that the plaintiffs' complaint should not have been dismissed. *Chadwick* at *393*, citing *Cohen* at 1093. "[I]t is not the plaintiffs who are seeking damages because of healing art malpractice; it is the defendants who are raising a defense based on their positions in the healing art fields." *Id*. (emphasis provided)

Lauren has alleged that Defendants, Timberline Knolls and Mr. Dattalo, failed to perform even a cursory search of a mentally ill patient who brought a large amount of controlled substances into the facility where Lauren was being treated, resulting in her attempted suicide. No medical judgment was necessary regarding such a glaring omission that violated the IMHDDC, and this is specifically pled in the First Amended Complaint.

With regard to Dr. West, Defendants' motion grossly misstates the contents of the First Amended Complaint claiming, "Plaintiff goes on to allege that Dr. West was negligent, in part, because during the time at issue she was a 'patient' of Dr. West's and Timberline Knolls'" (Motion, p. 6, lines 5 – 6). The words "negligence" or "negligent", however, do not appear anywhere in the allegations of the First Amended Complaint. Instead, it alleges that Dr. West abandoned Lauren outright, refusing to communicate with other medical personnel after her patient attempted suicide and at the time of Lauren's most desperate need, and that Dr. West's conduct in that regard was motivated purely by self-interest in violation of her statutory duties under the IMHDDC and her fiduciary duties to Lauren. No medical judgment was necessary regarding such outrageous conduct and this is specifically pled in the First Amended Complaint.

Defendants' motion cites *Jackson v. Chicago Classic Janitorial and Cleaning Service, Inc*., 823 N.E.2d 1055, 355 Ill App. 3d 906 (1st App. Dist. 2005) as "instructive on this issue."

- 9 -

(Motion, p. 6, line 12). Lauren agrees since the three factor test outlined by the *Jackson* court demonstrates that Section 2 - 622 is wholly inapplicable to the case at bar. The first factor is whether the standard of care involves procedures not within the grasp of the ordinary lay juror. *Id*. at 1057. It doesn't take any expertise at all to determine that a "secured" mental health facility such as Timberline Knolls that provides Level III Adolescent Residential Extended Care Services pursuant to a contract issued by the Illinois Department of Human Services, Office of Alcoholism and Substance Abuse needs to search each of its patients upon their return to the facility from outside its locked doors. As for Dr. West's conduct, there were no "procedures" whatsoever related to her refusals to respond to attempts by other medical providers to communicate over the course of 6 days.

The second *Jackson* factor is whether the activity is inherently one of medical judgment (*Id*.), and this simply does not apply, particularly with respect to Dr. West's refusals to communicate not only as a result of a desire to protect her own self-interests, but also as a result of Timberline Knolls management personnel instructing or otherwise requesting that she not communicate with Lauren's other medical care providers as alleged in the First Amended Complaint.

The third *Jackson* factor concerns the type of evidence that will be necessary to establish Lauren's case. *Id*. As previously stated, Lauren need not establish the standard of care applicable in a healing arts malpractice case here. With regard to the Breach of Statutory Duty count, she need only establish that the statutory provisions upon which she relies apply to her treatment by Timberline Knolls and Dr. West; that Timberline Knolls and Dr. West had a duty to refrain from engaging in conduct that violated those statutory provisions; that the conduct engaged in by Timberline Knolls and Dr. West did in fact violate those statutory provisions; and that Lauren was damaged thereby. With regard to the Breach of Fiduciary Duty count against Dr. West,

Lauren needs to prove (1) that a fiduciary duty existed, (2) that the fiduciary duty was breached, and (3) that she was damaged as a proximate cause of the breach. *See*, e.g., *Martin v. Heinold Commodities, Inc.*, 163 Ill.2d 33, 53, 205 Ill.Dec. 443, 643 N.E.2d 734, 744 (1994). None of those elements require any expert medical opinion and thus Section 2 – 622 does not apply.

Defendants' motion cites *Neade v. Portes*, 739 N.E.2d, 496, 193 Ill. 2d 433 (2000) for the broad proposition that doctors cannot be liable for breach of fiduciary duty. *Neade*, however, is readily distinguishable from the instant matter. First and foremost, unlike the case at bar, the plaintiff in *Neade* filed a complaint alleging both medical malpractice and breach of fiduciary duty against the same defendants based on the same set of facts. *Neade*, at 498. Further, that plaintiff's claim was based on <u>medical care actually provided</u> by the defendants to address his cardiac problems. *Id*. In the instant matter, of course, <u>Lauren's allegations concerning Defendants' malfeasance are wholly unrelated to any actual medical care at all, and are not based on any withholding of treatment based upon the exercise of medical judgment</u>. The First Amended Complaint alleges that Timberline Knolls and Mr. Dattalo did absolutely nothing to search a patient who returned to the facility and brought a dangerous and potentially lethal amount of controlled substances with her, and that such a glaring omission did not involve or require the exercise of medical judgment. After that omission resulted in Lauren's overdose/suicide attempt, the First Amended Complaint alleges that Timberline Knolls, Dr. West and Mr. Dattalo refused to respond to other medical providers for the sole purpose of protecting their own self-interests and attempting to protect Timberline Knolls' bottom line. Mr. DeDonato adopted the same party line, albeit to a much smaller degree. <u>None of this alleged conduct had anything to do with the exercise of medical judgment</u>. In short, and despite Defendants' contentions to the contrary, <u>this is simply not a medical malpractice case</u>, and the contents of the First Amended Complaint specifically frame Lauren's claims based on other theories of liability.

### IV. The First Amended Complaint States A Valid Count For Aiding And Abetting Breach Of Fiduciary Duty

Illinois has long recognized a cause of action for aiding and abetting a breach of fiduciary duty. *Wolf v. Liberis*, 153 Ill.App.3d 488, 505 N.E.2d 1202, 1208, 106 Ill.Dec. 411 (1st Dist. 1987); *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 799 N.E.2d 756, 768 – 769, 278 Ill.Dec. 891 (1st Dist. 2003). A claim for aiding and abetting a breach of fiduciary duty must satisfy the following elements: (1) the party whom the defendant aids must perform a wrongful act which causes an injury; (2) the defendant must be regularly aware of his role as part of the overall or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation. *Thornwood, Inc.* at 767.

The First Amended Complaint contains allegations necessary to satisfy those elements with respect to the conduct engaged in by Timberline Knolls, beginning with Count II (Paragraphs 124 – 168) alleging facts sufficient to make out a claim for breach of fiduciary duty by Dr. West based on wrongful conduct that caused Lauren to be damaged. Paragraph 174 specifically alleges that Timberline Knolls "was regularly aware of its role as part of the breach of fiduciary duty at the time that TIMBERLINE KNOLLS provided said assistance, aid and abetment." Paragraph 170 alleges that Timberline Knolls knowingly and substantially assisted the principal violation through management personnel who "instructed or otherwise requested WEST to not communicate with LAUREN's medical care providers at Silver Cross Hospital and/or Provena St. Joseph Medical Center given the desire of TIMBERLINE KNOLLS to implement damage control with regard to liabilities and financial exposures created by LAUREN's overdose/suicide attempt while under the care of Timberline Knolls." Finally, Paragraph 173 alleges that Timberline Knolls "knowingly and substantially provided assistance, aided and abetted WEST in breaching WEST's fiduciary duty to LAUREN." Defendants' claim

that the First Amended Complaint fails to state a cause of action for aiding and abetting breach of fiduciary duty is without merit.

## V. The First Amended Complaint States A Valid Count For Tortious Interference with Physician-Patient Relationship

Although perhaps inartfully pled, the facts alleged in Count IV of the First Amended Complaint liberally construed demonstrate tortious conduct in that (1) Mr. DeDonato engaged in willful conduct that directly interfered with an attempt by emergency medical providers to contact Dr. West only hours following Lauren's suicide attempt; (2) Mr. DeDonato did so knowing that Lauren's medical condition and corresponding emergency treatment would be adversely impacted by his conduct; and (3) Mr. DeDonato did so for the purposes of protecting the pecuniary interests of himself and his employer, Timberline Knolls, making a unilateral determination that Lauren's need for medical care was going to take a back seat to the post-multiple-overdose meeting, the substance of which as alleged in the First Amended Complaint was to implement a strategy designed to effect damage control with regard to potentially catastrophic liabilities and financial exposures created by the multiple overdoses. The alleged facts are more than specific enough for notice pleading under *Bell Atlantic Crop. V. Twombly*, 550 U.S. 544 (2007), and if this court deems such conduct to not be actionable under any legal theory, then Mr. DeDonato and others who may find themselves in similar situations will simply not be held accountable, and although Lauren will not argue that a tremendous ripple effect will occur, she nevertheless submits that public policy concerns against such conduct and the interests of justice require that Mr. DeDonato be held civilly accountable for his actions.

## VI. The First Amended Complaint States A Valid Count For Intentional Infliction of Emotional Distress

Like the plaintiff in *Chadwick*, supra, Lauren has properly stated a claim for intentional infliction of emotional distress. The First Amended Complaint alleges that after Lauren

attempted suicide using instrumentalities that Timberline Knolls allowed onto the facility premises, Timberline Knolls, Dr. West and Mr. Dattalo basically threw her under the bus by refusing to respond to numerous attempts to communicate by medical providers in a hospital emergency department and by a hospital's adolescent psychiatry department where Lauren was an inpatient for 5 days, all for the purposes of attempting to avoid or at least minimize liabilities and financial exposures. It is most definitely within the province of a jury to determine whether or not that conduct was extreme and outrageous. Moreover, the First Amended Complaint is replete with factual allegations concerning the extreme emotional distress caused not only by the overdose/suicide attempt itself, but because of Lauren's abandonment by these defendants. Paragraphs 194, 196 and 197 allege that Defendants (other than Mr. DeDonato) were aware that Lauren was particularly susceptible to emotional distress, and Paragraph 200 alleges that these defendants engaged in the conduct anyway while consciously disregarding the probability of causing Lauren to suffer emotional distress. Although the *Chadwick* court even denied a motion to dismiss a negligent infliction of emotional distress count in the face of a challenge that the overall complaint sounded in medical negligence, Lauren makes no such claim of negligent infliction in the instant action. For the same reasons and rationale stated by the *Chadwick* court and Lauren's argument hereinabove, she has sufficiently alleged a claim for intentional infliction of emotional distress.

    **VII.    The First Amended Complaint States A Valid Count For Breach Of Contract**

Defendants' motion, once again, takes the position that because medical providers are involved as defendants, healing art malpractice must be the only legal theory that can be applied to the allegations of the First Amended Complaint. Of course, Lauren's parents have no capacity to bring a medical malpractice action for themselves since no physician-patient relationship existed between them and any of the Defendants, nor did they receive any medical care. The

bottom line is that a written contract existed between Lauren's parents and Timberline Knolls that included a number of services wholly unrelated to medical treatment (i.e, safe housing, food, educational services, etc.) and Lauren was the intended third party beneficiary of that contract. To say that safe housing was not provided would be a major understatement, and this was a material term of the contract that was breached by Timberline Knolls. The First Amended Complaint has sufficiently pled a count for breach of contract.

## CONCLUSION

The thrust of Defendants' argument is that healing arts malpractice is the only possible legal theory for Lauren to pursue her rights and remedies in this matter because, and only because, Defendants' respective professions and occupations are in the medical field. The law in Illinois states otherwise, and although Defendants would like to wrap themselves in a broad blanket that can only be permeated by medical malpractice principles, they are not allowed to do so under the guise that whatever they may do is subject to that body of law alone. As discussed above, the cited authority recognizes the valid, separate nature of each and every count contained in the First Amended Complaint, which was specifically drafted to invoke Lauren's rights and remedies corresponding therewith. The instant motion to dismiss must accordingly be denied based on a liberal construction of the pleading pursuant to applicable law and the promotion of justice.

Respectfully submitted,

\_\_/S/\_\_\_JAMES A. HALES_____
Law Offices of JAMES A HALES, PLLC
1703 Koestner Street
Burlington, IA 52601
Telephone: (319) 572-0622
jhales@iowalaw.us.com
ATTORNEY FOR PLAINTIFF