UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAUREN H. HALES, | ) | |
| | ) | |
| PLAINTIFF, | ) | No. 15 C 2622 |
| | ) | |
| v. | ) | |
| | ) | Judge Thomas M. Durkin |
| TIMBERLINE KNOLLS, LLC, now known | ) | |
| as R.M. BROWN ENTERPRISES, LLC, | ) | |
| SEMONE M. WEST, M.D., THOMAS DATTALO | ) | |
| MARK DEDONATO, TIMBERLINE KNOLLS | ) | |
| HOLDING, LP, and TIMBERLINE KNOLLS | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lauren H. Hales, an Iowa resident, and former patient at Timberline Knolls residential treatment center, brings this suit alleging breach of statutory duty (Count I), breach of fiduciary duty and aiding and abetting breach of fiduciary duty (Counts II and III), tortious interference with physician-patient relationship (Count IV), intentional infliction of emotional distress (Count V), and breach of contract (Count VI). R. 54 (Second Amended Complaint). This Court has diversity jurisdiction[1] over Hales' claims pursuant to 28 U.S.C. § 1332.[2] *See* R. 54

---

[1] The Court is uncertain whether Timberline Knolls Management, LLC and Timberline Knolls Holding, LP, are completely diverse from Plaintiff because the citizenship of their members and partners, respectively, has not been plead in the operative complaint or otherwise set forth in the record. However, because the Court finds below that it lacks personal jurisdiction over either of these defendants, they are dismissed from the case without prejudice. The complete diversity of the remaining defendants is sufficient to establish jurisdiction.

¶¶ 3-20; R. 84-2 at 37. Defendants Timberline Knolls, LLC, Thomas Dattalo (President and Administrator of Timberline Knolls), and Mark DeDonato (Timberline Knolls' Director of Continuing Care) (collectively, the "Timberline Knolls Defendants") move along with Dr. Semone M. West (Hales' treating psychiatrist at Timberline Knolls) to dismiss each of the six counts alleged against them, whether individually or collectively, for failure to state a claim. R. 91. Defendants Timberline Knolls Holding, LP ("TK Holding") and Timberline Knolls Management, LLC ("TK Management") (collectively, the "Corporate Defendants") move to dismiss for lack of personal jurisdiction and for failure to state a claim. R. 83. For the reasons that follow, the Timberline Knolls Defendants' motion is denied with respect to Counts I-V and granted with respect to Count VI, and the Corporate Defendants' motion is granted.

## Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide

---

[2]     Plaintiff also alleges federal question jurisdiction in the Complaint, citing The Protection and Advocacy for Individuals with Mental Illness Act of 1986, 42 U.S.C. § 10801, *et seq.* Plaintiff does not seek damages under the Act, however, but rather invokes it to establish the standard of care, the alleged breach of which forms the basis to support her state law tort claims. The Court therefore does not consider this case to present a federal question under 28 U.S.C. § 1331. *See Merrell Dow Pharm. Inc. v. Thompson,* 478 U.S. 804, 817 (1986) ("We conclude that a complaint alleging a violation of a federal statute as an element of a state cause of action . . . does not state a claim 'arising under the Constitution, laws, or treaties of the United States.'")

defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

## Background

Hales was admitted to Timberline Knolls residential treatment center on September 18, 2010.[3] R. 54 at ¶ 27. Her admission was precipitated by a suicide attempt—the culmination of years of mental illness, frequent suicidal ideation, an extensive history of self-harm, and a recent episode of cocaine use and acute alcohol poisoning. *Id.* ¶ 29. Timberline Knolls was aware of Hales' mental health and

---

[3] Hales reached the age of majority on March 28, 2013, at which time the applicable statute(s) of limitations on her state law claims began to run. *See* 735 ILCS 5/13-211 ("If the person entitled to bring an action . . . at the time the cause of accrued, is under the age of 18 years . . . then he or she may bring the action within two years after person attains the age of 18 years."). This suit was filed on March 27, 2015.

substance abuse history, as well as relevant risk-factors in her family history, at the time of her admission. *Id.* ¶¶ 30-34.

Hales was housed in the Oak Lodge adolescent treatment building. *Id.* ¶ 35. In early November 2010, Hales experienced and received counseling regarding delusions of her own death. *Id.* ¶ 90. On November 23, 2010, another adolescent patient who had been on furlough with a parent returned to the facility with a "substantial amount" of unauthorized prescription medication. *Id.* ¶ 40-42. This patient was not searched by anyone at Timberline Knolls upon her arrival, and she was permitted to return the Oak Lodge building, where she proceeded to distribute the medication to Hales and others. *Id.* ¶¶ 43-44. Hales and five other patients ingested dangerous and potentially lethal doses of the medication; she and the others were transported by ambulance to local emergency rooms. *Id.* ¶¶ 45, 49-56. Timberline Knolls did not voluntarily disclose this incident to state regulators or industry accreditors. *Id.* ¶¶ 102-103.

After Hales was physically stabilized, she was admitted to the Department of Adolescent Psychiatry at a local hospital for further treatment, "suicide precautions" and "close observation." *Id.* ¶¶ 76, 84. During the period of her hospitalization, Hales "express[ed] and exhibit[ed] severe emotional distress, mental anguish, anxiety and humiliation," in part because of the restrictive and aggressively monitored nature of her confinement to what she referred to as "the psych ward." *Id.* ¶ 78. Dr. West, Hales' treating psychiatrist at Timberline Knolls, did not call to check on Hales, visit her while she was hospitalized, or return phone

calls (or pages) from the hospital or Hales' parents seeking input related to Hales' care. *Id.* ¶¶ 138-49.

On November 27, 2010, hospital personnel informed Hales that she was stable enough to be transferred back to Timberline Knolls. *Id.* ¶ 150. The hospital and Hales' father made numerous attempts to reach Dr. West, because before Hales could be released, Dr. West, as Hales' treating physician at Timberline Knolls, needed to be briefed on Hales' hospitalization and medical status. *Id.* ¶¶ 150-55. Dr. West's failure to respond to these calls and pages unnecessarily prolonged Hales' hospital stay. *Id.* Eventually, the hospital was directed to a different psychiatrist at Timberline Knolls. *Id.* at 156. Hales was discharged from the hospital as a "moderate" suicide risk on November 29, 2010, and transferred back to Timberline Knolls to complete her rehabilitation program. *Id.* ¶ 89.

## Discussion

I.    The Timberline Knolls Defendants and Dr. West

    A.    Count I: Breach of Statutory Duty

Count I of the complaint alleges a breach of statutory duty against the Timberline Knolls Defendants, citing The Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("Protection and Advocacy Act"), 42 U.S.C. § 10801, *et seq.*, two state mental health laws (the Mental Health and Developmental Disabilities Code ("Illinois Mental Health Code"), 405 Ill. Comp. Stat. Ann. 5/1-101, *et seq.*, and the Protection and Advocacy for Mentally Ill Persons Act ("Illinois Protection and Advocacy Act"), 405 Ill. Comp. Stat. Ann. 45/1, *et. seq.*)), and

generally identified "rules and regulations promulgated by the Illinois Department of Human Services" as the basis of the alleged breach. *Id.* (Count I). The claim catalogues various purported violations and consequent harms suffered, which fall, essentially, into three categories. First, the Timberline Knolls Defendants breached their statutory duty by failing to report the overdose incident. *Id.* ¶¶ 106-07. Second, the Timberline Knolls Defendants "failed to design, implement and maintain adequate security measures with respect to preventing the introduction of unauthorized control substances onto the Oak Lodge premises." *Id.* ¶¶ 114-16. Third, the Timberline Knolls Defendants subjected Hale to abuse and/or neglect, either intentionally or negligently, in derogation of their statutory duties. *Id.* ¶¶ 117-122.[4] The Court addresses each aspect of Count I in turn.

1. *Rules and Regulations Promulgated by the Illinois Department of Human Services.*

Hales vaguely alleges that Timberline Knolls was required to report the overdose incident pursuant to unspecified rules and regulations and that it failed to do so. Not only are these allegations threadbare at best, the duty they reference is one that would be owed to state regulators, not to Hales. To the extent Count I is based on Timberline Knolls' alleged duty to report, it is dismissed with prejudice.

2. *Illinois Mental Health Code*

The Timberline Knolls Defendants argue that Hales' claims under the Illinois Mental Health Code fail because the Code does not "expressly provide for" a private

---

[4] The remaining allegations in Count I refer solely to Dr. West, and are duplicative of the allegations set forth in Count II, which are addressed later in this opinion.

right of action. R. 91 at 2. Whether a statute expressly permits a private right of action is not dispositive of whether a plaintiff can base a claim for relief on a violation of statutory standards. In *Threlkeld v. White Castle Sys., Inc.,* 127 F. Supp. 2d 986, (N.D. Ill. 2001), the court explained the rule as follows:

> The [defendant] moves to dismiss the malpractice claim, arguing that there is no private right of action under the Mental Health Code. This is quite irrelevant. [The plaintiff] does not argue that she has a private right of action under the Code, but rather that the [defendants'] violations of the Mental Health Code give rise to a cause of action for negligence. Even where a statute does not create an express or implied right of action, it may establish a standard of care such that a plaintiff can make a prima facie case for negligence based on a violation of the statute.

*Id.* at 989 (citing *Cuyler v. United States,* 37 F. Supp. 2d 1099, 1103 (N.D. Ill. 1999) ("[S]tatutes and ordinances designed to protect human life or property establish the standard of conduct required of a reasonable person. In other words, they fix the measure of legal duty.")); *see also Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 582 (7th Cir. 2012) (citing authority for the proposition that violations of federal statutes and regulations are a common basis for negligence liability in tort proceedings); *see also* Restatement (Third) of Torts § 38 ("When a statute requires an actor to act for the protection of another, the court may rely on the statute to decide that an affirmative duty exists and to determine the scope of the duty.").

In order to state a negligence claim based on the violation of a statute, Hales must establish that: (1) the statute is designed to protect human life or property; (2) she is within the class of people protected by the statute; and (3) her injuries are the kind against which the statute was intended to protect. *See Threlkeld,* 127 F.

Supp. 2d at 989. If she adequately alleges a violation of the Illinois Mental Health Code, Hales may pursue a negligence claim arising therefrom if the violation plausibly caused her injuries. *Id.* She has done so here.

There can be no doubt that the Mental Health Code is designed to protect human life and that Hales, a patient at a mental health facility, is within the class of persons protected by the statute. The Code entitles patients like Hales to be free from "neglect," which it defines as the failure to provide "adequate medical or personal care or maintenance . . . which failure results in physical or mental injury to a recipient or in the deterioration of a recipient's physical or mental condition." 405 ILCS § 5/2-112; 405 ILCS § 5/117.1. Under the Code, "adequate care" refers to "services reasonably calculated to prevent further decline in the condition of a recipient of services so that he or she does not present an imminent danger to self or others." 405 ILCS 5/1-101.2. Hales alleges that the security measures and patient oversight at Timberline Knolls are inadequate to prevent the smuggling and distribution of controlled substances onto the premises, where patients suffering from mental illness are vulnerable to self-harm. This is sufficient to state a claim for negligence.

3.  *The Protection and Advocacy Acts (federal statute and state implementing law)*

The purpose of the Protection and Advocacy Acts is to protect individuals with mental illness from abuse, neglect and serious injury. 42 U.S.C. § 10801; 405

ILCS 45/1 (using substantially identical language[5]). Under the Act, the term "neglect" means, among other things, "the failure to provide a safe environment for [an] individual with mental illness." 42 U.S.C. § 10802(5); 405 ILCS 45/2(3). The Act furthermore provides that "[p]rior to instituting any legal action . . . on behalf of [an] individual with mental illness, *an eligible system, or a State agency or nonprofit organization which entered into a contract with an eligible system under section 10804(a) of this title*, shall exhaust in a timely manner all administrative remedies where appropriate." 42 U.S.C. § 10807 (emphasis added); 405 ILCS 45/3(D) (substantially identical language).

Defendants do not argue that Hales has failed to allege an "[un]safe environment for [an] individual with a mental illness." Rather, they argue that Hales' failure to exhaust administrative remedies is fatal to her claims based on violations of these statutes. R. 91 at 5. Defendants do not cite any authority beyond the statute itself, and entirely ignore the italicized language, which explicitly limits the exhaustion requirement to entities with government contracts. *See also* 42 U.S.C.A. § 10804(a) (setting forth contract eligibility requirements). Defendants' exhaustion argument is thus without merit.

---

[5]     The Illinois statute uses the phrase "mentally ill persons," while the federal statute uses the phrase "individuals with mental illness." The mental health community prefers to describe those living with mental health conditions using "person-centered" language, *e.g.* "person living with bipolar disorder" instead of "bipolar person." *See* "Person-Centered Language," Mental Health America, *available at* http://www.mentalhealthamerica.net/person-centered-language (last visited October 17, 2016).

More importantly, however, Hales is not asserting a claim under the Protection and Advocacy Acts in the sense that she is seeking statutory relief. Rather, as articulated above, she asserts that the Timberline Knolls Defendants were negligent on the basis of their failure to meet the standards of care set forth in the statutes, which in turn, caused her harm.

### 4. Negligence

Courts have permitted common law negligence claims on similar facts. In *Siklas v. Ecker Center for Mental Health, Inc.*, 617 N.E.2d 507 (Ill. App. Ct. 1993), a plaintiff living with paranoid schizophrenia sought treatment from the defendant mental health center (the "Center"). The Center was not a residential facility, but did procure housing for a number of its patients, including the plaintiff and his roommate, who was also receiving treatment for mental illness. While living under the Center's supervision and undergoing treatment, the plaintiff sustained a serious knife injury inflicted by his roommate. *Id.* at 510. The plaintiff sued for damages in Illinois state court on the basis of the Center's failure to protect him. *Id.* The Center moved for summary judgment, which was granted, arguing that it had no duty to protect the plaintiff from the criminal acts of his roommate. *Id.* Reversing the order of judgment for the Center, the appellate court explained:

> Implicit in [the Center]'s undertakings [to procure housing for the plaintiff and his roommate] was the obligation to determine, insofar as possible, that plaintiff remained safe in his housing, despite his illness. [The Center] monitored both plaintiff's and [his roommate's] mental conditions . . . In our view, the services which [the Center] undertook to provide to plaintiff were the kind of services which it should have recognized as necessary for

> the protection of plaintiff's person. Too, any failure on [the Center]'s part to exercise reasonable care increased the risk of harm to plaintiff . . . It is evident also that, due to his illness, plaintiff relied on [the Center]'s assistance and, ultimately, was injured in a situation substantially created and maintained by [the Center] as part of its services.

*Id.* at 513.

The parallels between *Siklas* and this case are obvious. Like the plaintiff in *Siklas*, Hales was living under the supervision of her mental health care provider, Timberline Knolls. Indeed, she was living in Timberline Knolls' direct custody, on the very premises where she received therapy and other treatment. Timberline Knolls was acutely aware by virtue of its provision of mental health services to Hales that she had history of depression, substance-abuse, self-harm, and suicidal ideation. For the same reasons, Timberline Knolls was aware of the propensities and vulnerabilities of other residents living on site. Therefore, Timberline Knolls should have recognized its obligation to ensure, insofar as possible, that its patients remained safe from themselves and from one another. In other words, Timberline Knolls owed its residents a common law duty of care. *See, e.g., Peterson v. Kings Gate Partners-Omaha I, L.P.*, 861 N.W.2d 444, 449 (Neb. 2015) (sustaining a common negligence law claim against the landlord of senior apartment building for his alleged failure to protect a resident from assault by another resident's son). The Restatement (Third) of Torts is instructive:

> An actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship. Special relationships giving rise to the duty provided in

> Subsection (a) include . . . a custodian with those in its custody.

Restatement (Third) of Torts § 40. "[C]ustodial relationships that courts have recognized as imposing an affirmative duty [of care] include day-care centers and the children for whom they care, hospitals and their patients, nursing homes with their residents." *Id*. cmt. n. The special relationship between an in-patient rehabilitation facility and its resident-patients is analogous. Timberline Knolls had a duty to exercise reasonable care to keep Hales safe. Having alleged that the Timberline Knolls Defendants were negligent in failing to prevent the smuggling of contraband leading to the overdose incident, Hales has stated a plausible claim for relief.

In summary, Hales has adequately alleged a negligence claim against the Timberline Knolls Defendants based on breaches of both statutory and common law duties of care. Except as to the claim for failure to report, Defendants' motion to dismiss Count I is denied.

B.     Counts II-IV: Breach of Fiduciary Duty and Tortious Interference with and Aiding and Abetting Breach of Physician-Patient Relationship

Count II alleges breach of fiduciary duty against Dr. West. *Id*. ¶ 158. This claim relates specifically to Dr. West's failure to take or return any phone calls or pages from the hospital following the overdose emergency, during the period of Hales' hospital admission, and in anticipation of Hales' discharge. *Id*. ¶¶ 137-44. Counts III and IV allege that the Timberline Knolls Defendants aided and abetted Dr. West's breach of fiduciary duty and/or tortiously interfered with the physician-patient relationship by instructing Dr. West not to speak with Hales and by

refusing to transfer calls or deliver messages from the hospital to Dr. West. *Id.* ¶¶ 176-77. Hales alleges that in "abandoning" her after the suicide attempt, Dr. West, of her own accord and at the behest of the Timberline Knolls Defendants, placed the legal and financial concerns of Timberline Knolls above Hales' medical needs. *Id.* ¶¶ 166-67, 178.

The Timberline Knolls Defendants and Dr. West do not dispute that Dr. West owed Hales a fiduciary duty. This is no surprise, since "it is well settled in Illinois and, indeed, throughout the United States that there exists, between a patient and his treating physician, a fiduciary relationship founded on trust and confidence." *Petrillo v. Syntex Labs., Inc.*, 499 N.E.2d 952, 961 (1986) (internal citations omitted); *see also United States v. Vasquez-Ruiz,* 2002 WL 1880127, at *2 (N.D. Ill. Aug. 12, 2002), *rev'd on other grounds*, 502 F.3d 700 (7th Cir. 2007) ("A fiduciary duty is implicit in the relationship between physician and patient."). Rather, in support of their argument for dismissal, the Timberline Knolls Defendants and Dr. West contend that all claims premised on Dr. West's fiduciary duty to Hales implicate her medical judgment and therefore require an affidavit certifying review by a medical expert under the Illinois Healing Arts Malpractice Act, 735 ILCS 5/2-622. R. 91 at 5-6.

The Healing Arts and Malpractice Act provides that "[i]n any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries . . . by reason of medical, hospital, or other healing art malpractice, the plaintiff's attorney . . . shall file an affidavit attached to the original . . . complaint" certifying

that the attorney has conferred with a qualified, knowledgeable healthcare professional who, upon reviewing the medical record, concluded that the plaintiff had a reasonable and meritorious cause for filing suit. 735 ILCS 5/2-622(a)(1). The failure to file such a certificate is grounds for dismissal. 735 ILCS 5/2-622(g). Hales did not file a 2-622 affidavit with her complaint. She argues that no affidavit was necessary because her claims against Dr. West do not sound in malpractice.

Courts have given broad application to the phrase "healing art malpractice." *Milos v. Hall*, 757 N.E.2d 654, 657 (Ill. App. Ct. 2001) (citing *Lyon v. Hasbro Indus., Inc.,* 509 N.E.2d 702, 705-06 (Ill. App. Ct. 1987)). Even so, "not every act or omission committed by a physician . . . constitutes healing art malpractice." *Id.* (citing *Cohen v. Smith,* 648 N.E.2d 329, 333–34 (Ill. Ct. App. 1995) (nonconsensual touching by nurse not "healing art malpractice"); *Edelin v. Westlake Cmty. Hosp.,* 510 N.E.2d 958, 961 (Ill. Ct. App. 1987) (failure to follow hospital policy requiring patients to be escorted from the property in a wheelchair not "healing arts malpractice")). Rather, a claim for healing arts malpractice lies only "when a professional applies his expert knowledge or skill in an unreasonably deficient way resulting in injury." *Awalt v. Marketti*, 2012 WL 1161500, at *4 (N.D. Ill. Apr. 9, 2012) (citing *Purtill v. Hess*, 489 N.E.2d 867, 871 (Ill. 1986)). The nature of the act alleged determines whether the challenged activity constitutes healing art malpractice and falls within the ambit of Section 2-622. *Id.*

The case of *In re Odeh*, 431 B.R. 807 (Bankr. N.D. Ill. 2010), is instructive. In *Odeh*, a bankruptcy court considered a breach of fiduciary duty claim advanced by a

petitioner against her deceased-husband's doctor. *Id.* The petitioner alleged that the doctor altered or falsified her husband's medical records to avoid malpractice liability. *Id.* The doctor argued that the breach of fiduciary duty claim was duplicative of the petitioner's malpractice claim. *Id.* at 811. To decide the matter, the court examined the "operative facts together with the injury," concluding that the breach of fiduciary duty claim was "qualitatively different from an action for medical practice." *Id.* at 812-13. This was so, the court explained, because "showing that [the doctor] falsified [the patient's] records will not establish that [the doctor] failed to provide adequate medical services." *Id.* at 813. Rather, [the doctor] abused a position of power and confidence in a manner quite distinct from the quality of medical services he rendered." *Id.* Accordingly, the court found a non-dischargable claim for breach of fiduciary duty because "[t]he complaint alleges that [the doctor] altered [the husband]'s medical records to protect [his] personal financial interest in avoiding malpractice liability at the expense of the patient's interest, violating a duty at the core of the fiduciary relationship." *Id.* at 815 (citing *Petrillo*, 499 N.E.2d at 961); *see also Milos*, 757 N.E.2d at 182 (finding that a pathologist's failure to include certain facts in an autopsy report "was not based upon medical judgment but was based entirely upon a desire to protect [the hospital] from a potential civil action.").

So too, here. Hales does not make any allegations regarding the adequacy of the mental health treatment she received from Dr. West. Indeed, from Hales' decision to return to Timberline Knolls, one might conclude that she believed Dr.

West was at least a competent psychiatrist. Hales alleges, however, that in the days following the overdose incident, when Hales was no longer under Dr. West's care and was instead receiving treatment at a local hospital, Dr. West put the reputational and financial interests of Timberline Knolls above the immediate medical needs of Hales, her patient, to whom she owed a fiduciary duty. This left Hales without the ability to obtain critical medical information under emergent circumstances and also to be expediently discharged to a less restrictive mental health treatment facility.

Dr. West and the Timberline Knolls Defendants argue that Dr. West's determination regarding how frequently to communicate with the hospital was an exercise of medical judgment. They furthermore argue that any duty Dr. West had to return phone calls must be established by reference to expert testimony regarding standards governing communication between health care providers under circumstances like those alleged here. Neither argument convinces this Court that Hales has alleged a healing arts malpractice claim. First, the Court disagrees that returning phone calls regarding a patient's medical history, treatment plan, and logistics for her transfer from one facility to another requires an exercise of medical judgment. More importantly, even if expert testimony is required to establish the scope of Dr. West's duty to communicate with Hales' medical providers, it does not convert Hales' claim to one sounding in medical healing art malpractice; the breach alleged here does not arise from the inadequate provision of care, but rather from the Defendants' decision to have Dr. West become incommunicado, which placed

their interest in mitigating civil liability above Dr. West's fiduciary obligation to Hales, resulting in harm to Hales. *See Milos*, 757 N.E.2d 658. The motion to dismiss the breach of fiduciary duty claim is therefore denied.

Because the Court finds that Hales has stated a claim for breach of fiduciary duty against Dr. West, the claims for concerted action liability against The Timberline Knolls Defendants are allowed. *See Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767-68 (2003) (citing Restatement (Second) of Torts § 876) (explaining that under the theory of concert of action in Illinois, a party may be held liable for substantially assisting or encouraging a breach of fiduciary duty).

C.     Count V: Intentional Infliction of Emotional Distress

Count V alleges intentional infliction of emotional distress for all of the reasons set forth in Counts I-IV. *Id.* The Court considers Count V to assert two separate claims—one arising from the circumstances leading to the overdose incident (Count I), and another arising from Dr. West's failure to return calls regarding Plaintiff's medical care and transfer back to Timberline Knolls (Counts II-IV). To state a claim for intentional infliction of emotional distress, a plaintiff must allege that (1) the defendant engaged in "extreme and outrageous" conduct toward the plaintiff, (2) the defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress, (3) the plaintiff endured "severe or extreme" emotional distress, and (4) the defendant's conduct actually and proximately caused the plaintiff's distress. *Ulm v. Mem'l Med. Ctr.*, 964 N.E.2d 632, 641 (Ill. App. Ct. 2012). To survive a motion to dismiss, a plaintiff must allege that "the distress inflicted is so severe that no

reasonable [person] could be expected to endure it." *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 981 N.E.2d 1069, 1082 (Ill. App. Ct. 2012)

Hales has sufficiently alleged extreme emotional distress. After overdosing in an attempt to commit suicide, which is extremely distressing in and of itself, Hales found herself bound by restraints to a hospital gurney for hours while doctors assessed her level of risk of self-harm. She was later committed to a hospital's psychiatric unit, where she remained days after being cleared for discharged because Dr. West refused to return calls to facilitate her expedient return to Timberline Knolls. Courts have permitted intentional infliction of emotional distress claims where, as here, the tortious conduct alleged arises from a breach of statutory duty. *See Barrios v. Sherman Hosp.*, 2006 WL 3754922, at *2 (N.D. Ill. Dec. 15, 2006) (citing *Chadwick v. Al-Basha*, 692 N.E.2d 390, 393 (Ill. App. Ct. 1998) (permitting an intentional infliction of emotional distress claim based on alleged violations of the Emergency Medical Treatment and Active Labor Act)). Hales may also proceed as to the second prong of her intentional infliction of emotional distress claim because by virtue of their professional experience and familiarity with Hales, the Dr. West and the Timberline Knolls Defendants reasonably could have foreseen that their refusal to communicate with Hales' care providers at the hospital would unnecessarily prolong her hospital stay.

### D. Count VI: Breach of Contract

Finally, in Count VI, Hales asserts a breach of contract claim against Timberline Knolls as the third party beneficiary of the contract for treatment

between the Timberline Knolls and Hales' parents. R. 54 ¶¶ 208-213. Specifically, Hales alleges in a conclusory fashion that "by engaging in the acts and omissions" alleged in Counts I-IV, Timberline Knolls "breached [their] contract [with Hales' parents] by failing to provide adequate mental health care to [Hales] in a safe environment." *Id.* ¶ 211. Hales does not attach the contract to the pleadings or reference in Count VI (or anywhere else in the Complaint) the specific provisions she claims were breached. Although Hales is not procedurally required to attach the contract to state a claim for breach, *see Liu v. Nw. Univ.*, 78 F. Supp. 3d 839, 846-47 (N.D. Ill. 2015), her failure to identify or set forth any particular provision or contractual language is fatal to her claim. Claim VI is therefore dismissed. Because this is Hales' third pleading, and because discovery is already well underway, this claim is dismissed with prejudice.

II.    The Corporate Defendants

The Corporate Defendants move separately to dismiss, arguing that Plaintiff's "threadbare" and "conclusory" allegations are insufficient to confer personal jurisdiction on this Court or to sustain a claim for direct or vicarious liability for the conduct alleged in the Complaint. R. 84. The Court first considers the motion to dismiss for lack of personal jurisdiction. If the Court determines that it lacks jurisdiction over the Corporate Defendants, it need not (and indeed, cannot) consider the merits of the claims against them.

A.    Personal Jurisdiction

An action against a party over whom the Court lacks personal jurisdiction must be dismissed. Fed. R. Civ. P. 12(b)(2). A complaint need not include facts alleging personal jurisdiction. *Steel Warehouse of Wis., Inc. v. Leach,* 154 F.3d 712, 715 (7th Cir. 1998). However, once a defendant moves to dismiss the complaint under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of establishing the existence of jurisdiction. *See Purdue Research Found. v. Sanofi–Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). If the defendant submits affidavits or other evidence opposing the exercise of jurisdiction, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* "The Court resolves factual disputes in the pleadings and affidavits in favor of the party asserting jurisdiction, but takes as true those facts contained in the defendant's affidavits that remain unrefuted by the plaintiff." *Chi. Reg'l Council of Carpenters v. Joseph J. Sciamanna, Inc.*, 2009 WL 1543892, at *2 (N.D. Ill. June 3, 2009).

The basis implied in the Complaint for personal jurisdiction over the Corporate Defendants is that they are alter egos of Timberline Knolls, which conducts business in Illinois and is thus indisputably within the general jurisdiction of the Court. *See Council of Carpenters*, 2009 WL 1543892, at *2. "Under Illinois law, a corporation is a legal entity separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated." *Id.* at *2 (citing *Van Dorn Co. v. Future Chem. and Oil Corp.,* 753 F.2d

565, 569 (7th Cir. 1985)). A court may disregard the separate corporate entity, however, if it determines that two corporations are so interconnected in interest and ownership that the separate corporations no longer exist and that recognition of the separate existence would promote fraud or injustice. *Id.* To determine whether one corporation maintains the requisite degree of control over another to justify an alter ego finding, a court may consider several factors, including the failure to maintain adequate corporate records or to comply with corporate formalities, the commingling of funds or assets, undercapitalization, and whether one entity treats the assets of the other as its own. *Id.* Courts may also consider whether the two entities have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Id.* (citing *Int'l Union of Operating Eng'rs, Local 150, AFL–CIO v. Rabine,* 161 F.3d 427, 433 (7th Cir. 1998)).

Plaintiff alleges, in summary, that TK Holding and TK Management are general partners, that TK Holding holds a majority interest in Timberline Knolls, that TK Management "provid[ed] management, administrative and supervisory services to Timberline Knolls," and that Timberline Knolls conducted its business "at the direction of, at the behest of, or in concert with" TK Management. R. 54 ¶¶ 21-24. Plaintiff alleges that for these reasons, and due to "a significant degree of commonality and overlapping characteristics . . . with regard to the Members, Managers, Partners, and Officers" of the entities, TK Holding and TK Management "are inextricably intertwined with" Timberline Knolls and as such are alter egos

jointly subject to the jurisdiction of this Court and to liability for the harms alleged. *Id.* ¶ 25.

Attached to the Corporate Defendants' motion to dismiss for lack of subject matter jurisdiction is the affidavit of O. Haynes Morris, Jr., a Manager of Timberline Knolls and TK Management. *See* 84-1 ("Morris Aff."). In it, Morris states that TK Management holds a minority (46%) "passive membership" interest in Timberline Knolls (Morris Aff. ¶ 9) and that neither of the Corporate Defendants provides management, administrative or supervisory services to Timberline Knolls (Morris Aff. ¶¶ 7-9, 10-11). Indeed, the limited liability agreement, attached as Exhibit A to the affidavit, R. 84-2, reflects as much. *See* Section 4.13 ("The only matters upon which Members shall vote are (i) whether to sell the Company or its assets, (ii) whether to dissolve and windup the affairs of the Company, (iii) whether to adopt any amendment to this Agreement, (iv) the election of Managers," and whether to admit or remove members or issue securities); Section 4.7 ("[N]o member shall have any voice, nor take part in the conduct, control or management of the business of the Company in its capacity as a Member"). Morris also states that the Corporate Defendants keep separate books, tax returns, and financial statements from Timberline Knolls (Morris Aff. ¶ 13). Finally, Morris states that "[o]ther than the passive investment in Timberline Knolls, LLC, neither TK Holding nor TK Management has any other contact with the State of Illinois" (Morris Aff. ¶ 15).

Far from proffering evidence refuting the Morris Affidavit, Plaintiff all but concedes in her response that the Corporate Defendants are not Timberline Knoll's

alter-egos. Instead, she shifts the argument to suggest that the Corporate Defendants are subject to the Court's specific personal jurisdiction because they directly participated in the conduct that harmed her. *See* R. 99 at 4. ("While it is true that commonality in ownership, management and control are not enough to pierce the corporate veil or otherwise impose vicarious liability, the Illinois Court has recently spoken loud and clear on the propriety of imposing that liability when the affiliated company is also a direct participant."). But the Complaint does not allege the Corporate Defendants' direct involvement, and Plaintiff's response to the Corporate Defendant's motion to dismiss merely reiterates the general allegations set forth in the Complaint. R. 99 at 3 ("TK Management was providing general management, administrative and supervisory services to Timberline Knolls, LLC, regarding oversight and maintenance of the patient residential facility"). These general allegations of supervision and management are refuted by the Morris affidavit and the Limited Liability Agreement attached thereto.[6] In summary,

---

[6]  Plaintiff suggests that she should be allowed to pursue the merits of her alter-ego theory in discovery. Even if this Court had jurisdiction over the Corporate Defendants, which it does not, it would nevertheless refuse to permit discovery on the threadbare and incomplete allegations in the operative complaint. Plaintiff's allegations against the Corporate Defendants relate exclusively to common ownership and leadership, shared corporate resources, and some level of control or supervision by the Corporate Defendants over the operations of Timberline Knolls. But to state a claim for alter-ego liability, a plaintiff must allege more than mere commonality and overlap, it must allege that "(1) the corporation was so controlled and manipulated that it had become a mere instrumentality . . . and (2) recognition of a separate corporate identity would sanction a fraud or promote injustice." *Rehabcare Grp. East, Inc. v. Certified Health Mgmt., Inc.*, 2007 WL 3334500, at *2 (N.D. Ill. Nov. 8, 2007) (internal punctuation and citation omitted) (dismissing on the merits an alter-ego claim plead almost identically to the claim here); *see also id.* at *2-3 (collecting cases granting motions to dismiss alter-ego claims where

Plaintiff failed to come forward with additional evidence in support her alter-ego theory, and failed to make any concrete allegations of the Corporate Defendant's direct participation in the wrongful conduct alleged.[7]

The Court lacks jurisdiction over TK Management and TK Holding. They are dismissed from the case.

## Conclusion

For the foregoing reasons, Dr. West and the Timberline Knolls Defendants' motion to dismiss is granted in part and denied in part with respect to Count I,

---

plaintiffs failed to accomplish the "daunting" task of alleging the high level of dominion, control and unfairness an alter-ego claim requires). Even if the Court ignored the Morris Affidavit and took the allegations in the Complaint as true, they still miss the mark.

[7]    Though it has not been briefed, it bears mention that there is one other way the Corporate Defendants might be subject to the personal jurisdiction of this Court. Where "a subsidiary corporation is acting as the parent corporation's Illinois agent in the sense of conducting the parent's business rather than its own," the exercise of jurisdiction is proper. *Alderson v. S. Co.*, 747 N.E.2d 926,, 944 (Ill. App. Ct. 2001); *see also Capgain Props. Inc. v. Landmaster Partners, LLC*, 2016 WL 3035534, at *2 (N.D. Ill. May 29, 2016) ("Personal jurisdiction over an entity is appropriate when minimum contacts are established through an agent of the entity."). Certainly the relationship between the Corporate Defendants and Timberline Knolls raises a question of agency-based personal jurisdiction. After all, the Morris affidavit attests that TK Holding, the limited partner of TK Management, owns a substantial minority stake in Timberline Knolls. It also alleges a degree of overlap in the membership and management of the TK Management and Timberline Knolls. But "standing alone, the existence of common officers or directors serving both corporations is not sufficient to confer jurisdiction over a nonresident parent corporation." *Alderson*, 747 N.E.2d at 944. Therefore, and because the Morris affidavit and exhibits reflect a lack of substantial control by the Corporate Defendants over the business of Timberline Knolls, the Court finds that it cannot exercise personal jurisdiction over either of the Corporate Defendants by way of the agency theory of minimum contacts. Plaintiff may request a reconsideration of this determination at the next status hearing if she has adduced new information tending to establish that Timberline Knolls is an agent of either or both of the Corporate Defendants.

denied with respect to Counts II-V, and granted with respect to Count VI. The Corporate Defendants' motion to dismiss is granted.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: January 3, 2017